745 P.2d 976

**WESTWOOD HOMEOWNERS ASSOCI-ATION, an Arizona non-profit corporation, Plaintiff-Appellee,**

v.

**Charles and Sylvia TENHOFF, husband and wife, Jeff and Alice Gierhan, husband and wife; the Mesa Association for Retarded Citizens, an Arizona corporation, Defendants-Appellants.**

**No. 1 CA–CIV 8957.**

Court of Appeals of Arizona,
Division 1, Department A.

Sept. 3, 1987.

Review Granted Dec. 15, 1987.

Wright & Decker by Roger C. Decker, Ryan P. Dyches, Mesa, for plaintiff-appellee.

Reynolds, Rhodes & Golston by Rodger A. Golston, Mesa, and Lewis and Roca by John P. Frank, Steve Bender, Janet Napolitano, Phoenix, for defendants-appellants.

## OPINION

GRANT, Presiding Judge.

This is an action for declaratory and injunctive relief to compel the closing of a Mesa home in which six developmentally disabled persons live. The plaintiff, Westwood Homeowners Association, an Arizona non-profit corporation (Westwood), contends that this use of the home violates a restrictive covenant. Westwood was granted summary judgment by the trial court.

## FACTS

The facts are not in conflict. The appellants own a home in Mesa. Six or fewer developmentally disabled children and young adults live in the home with an employee who provides them with "parental" care. The house has been financed by appellant Mesa Association for Retarded Citizens (MARC), which in turn is under contract with the Arizona Department of Economic Security (DES). Westwood is an Arizona nonprofit corporation formed by homeowners in the area to challenge the legality of the appellant's housing arrangement.

In its motion for summary judgment, Westwood argued that the home violated several of the declarations of restrictions filed with the Maricopa County Recorder in 1959. MARC disputed this claim in its cross motion for summary judgment. MARC also argued in its supplemental objection to the form of judgment that any restrictive covenants precluding the home should be held void as against public policy and the equal protection clauses of the United States and Arizona Constitutions. The trial court awarded summary judgment for Westwood and MARC appealed.

## ISSUES

(1) Does the residential facility violate the plain language of the restrictive covenants? (2) What is the public policy regarding residential facilities and how does it interact with the restrictive covenants at issue here? (3) What impact does A.R.S. § 36–582(G) have on that public policy? (4) Are the covenants invalid under the equal protection clauses of the United States and Arizona Constitutions? (5) Did the trial court properly exclude the Holsclaw Report, the Talent Report and defendant's supplementary affidavits from the record below? (6) Did the trial court err in awarding plaintiff attorney's fees?

## THE RESIDENTIAL FACILITY AND THE RESTRICTIVE COVENANTS

The declaration of restrictions on the property, filed with the Maricopa County Recorder in 1959, contains the following paragraph:

8. No livestock or poultry shall be kept on any of said lots and no store, office, or other place of business of any kind and no hospital, sanitarium, or other place for the care or treatment of the sick or disabled, physically or mentally, nor any theater, saloon or other place of entertainment shall ever be erected or permitted upon any of said lots, or any part thereof, and no business of any kind or character whatsoever shall be con-

ducted in or from any residence on said lots.

■ The trial court found that the appellants' operation of the residential facility for the developmentally disabled violated this restriction. The facility is admittedly a place for the care of individuals who are physically or mentally disabled. The appellants admit throughout their briefs that the facility provides care for such persons and in fact states that these persons live in the facility with an employee who provides them with "parental" care. The words used in the restrictive covenant must be given their plain ordinary meaning. *Duffy v. Sunburst Farms East Mut. Water & Agric. Co.*, 124 Ariz. 413, 416, 604 P.2d 1124, 1127 (1979); *Divizio v. Kewin Enter.*, 136 Ariz. 476, 481, 666 P.2d 1085, 1090 (App.1983). Therefore, the trial court correctly found that the facility used to care for mentally disabled individuals violated the plain words of the deed restriction.

The trial court also found that the state licensed and funded residential care facility violated the prohibition that "no business of any kind or character whatsoever shall be conducted in or from any residence on said lots," relying on *Seaton v. Clifford*, 24 Cal.App.3d 46, 100 Cal.Rptr. 779 (1972). Because the home violates the previously stated portion of the deed restriction by being a place for care of mentally disabled individuals, we need not decide whether the

facility is a business within the meaning of the deed restriction. Likewise we need not reach the question of whether it violates the "single family dwelling house" restriction.

## PUBLIC POLICY

This case concerns two conflicting public policies. On one hand, Arizona recognizes a public policy of enforcing the private restrictive covenants of land owners. *E.g., Tucson-North Town Home Apartments Homeowners' Ass'n v. Robb*, 123 Ariz. 4, 6, 596 P.2d 1176, 1178 (App.1979). On the other hand, Arizona has adopted the public policy of assisting the developmentally disabled by promoting their deinstitutionalization. This public policy is codified in part in the Developmental Disabilities Act of 1978. *See* Laws 1978, Ch. 198. Having decided that the facility violates the covenant, we must now decide if the policy in favor of the development of residential facilities for the mentally disabled should take precedence over the countervailing policy of freedom of contract.

The trend toward deinstitutionalization, the maintenance of disabled persons in a residential setting, began in the late 1960's. It has since spread throughout the United States.[1] At least thirty states, including Arizona, have adopted statutes in aid of this movement.[2]

1. *See* Boyd, *Strategies in Zoning and Community Living Arrangements for Retarded Citizens: Parens Patriae Meets Police Power*, 25 Vill.L.Rev. 273 (1979–80); Chandler & Ross, *Zoning Restrictions and the Right to Live in the Community* in The Mentally Retarded Citizen and the Law 306 (M. Kindred, et al. eds. 1976); Lippincott, *A Sanctuary for People: Strategies for Overcoming Zoning Restrictions on Community Homes for Retarded Persons*, 31 Stan.L.Rev. 767 (1979); Comment, *Zoning the Mentally Retarded Into Single-Family Residential Areas: A Grape of Wrath or the Fermentation of Wisdom*, 1979 Ariz.St.L.J. 385.

2. A.R.S. § 36–581 *et seq.* (1978); Cal.Welf. & Inst.Code §§ 5115, 5116 (West 1984); Colo.Rev. Stat. § 30–28–115(2)(a) (1986); Conn.Gen.Stat. Ann. § 8–3e (1986); Del.Code Ann. tit. 22, § 309 (1981); Idaho Code § 67–6531 (1980); Ind.Code § 16–13–21–12 (Burns 1986); La.Rev.Stat.Ann. § 28:478 (Supp.1987); Md.Ann.Code, Health-General, § 7–601 *et seq.* (1982); Mich.Comp.

Laws § 330.1708 (1986); Minn.Stat.Ann. § 462.357 (Subd. 6a) (1986); Mo.Ann.Stat. § 89.020.2 (Vernon Supp.1987); Mont.Code Ann. § 76–2–412 (1985); Nev.Rev.Stat. § 278.021 (1985); N.J.Stat.Ann. § 40:55D–66.1 (West Supp.1986); N.M.Stat.Ann. § 3–21–1(C) (1985); N.Y.Mental Hyg.Laws § 41.34(f) (Supp. 1987); N.C.Gen.Stat. § 168–22 (1982); N.D.Cent. Code § 25–16–14(2) (Supp.1985); Ohio Rev. Code Ann. § 5123.19 (Anderson 1981); Or.Rev. Stat. § 443.600 (1985); R.I.Gen.Laws § 45–24–22 (1980); S.C.Code § 6–7–830(a) (Supp.1986); Tenn.Code Ann. § 13–24–102 (1980); Tex.Rev.Civ.Stat. art. 1011n (Vernon Supp.1986); Vt.Stat.Ann. tit. 24, § 4409(d) (Supp.1986); Va.Code § 15.1–486.2 (1981); Wash.Rev.Code Ann. § 49.60.224(1) (Supp. 1987); W.Va.Code § 27–17–4 (1986); Wis.Stat. Ann. § 59.97(15)(c) (Supp.1986). Ohio's legislation has been held unconstitutional by that state's supreme court for reasons that are not relevant to this action.

Judicial interpretations of these statutes have followed this trend, bolstering the public policy in favor of deinstitutionalization. For example, in the early case of *Seaton v. Clifford*, 24 Cal.App.3d 46, 100 Cal.Rptr. 779 (1972), the court held that restrictive covenants should be strictly enforced to exclude residential facilities, notwithstanding statutes prohibiting local governments from excluding these facilities. This result, in effect, allowed private homeowners to do what was forbidden to government. Ten years later, another division of the California Court of Appeals came to the opposite result in *Welsch v. Goswick*, 130 Cal.App.3d 398, 181 Cal.Rptr. 703 (1982). It found that in light of the statutory enactments, private homeowners could not exclude residential facilities without showing the facility would somehow harm or alter the neighborhood. The statute in dispute was the same in both cases. However, the later court was far more willing to construe it to promote establishment of residential facilities. It found the 10-year-old *Seaton* decision of "limited persuasive value" because the issue of deinstitutionalization "is one of changed circumstances in a rapidly developing area of social concern...." *Id.* at 407, n. 7, 181 Cal.Rptr. at 708, n. 7. The court, citing recent case law from several jurisdictions, concluded the restrictive covenant "should no longer be interpreted to preclude" the operation of a residential facility. *Id.*

MARC contends that the Developmental Disabilities Act evidences a public policy in favor of residential facilities, such as this home, which is stronger than the public policy in favor of enforcing a contrary private covenant. To evaluate MARC's claim, "the court must look to legislative intent to determine whether a contract contrary to law is void as against policy." *E & S Insulation Co. v. E.L. Jones Constr. Co.*, 121 Ariz. 468, 470, 591 P.2d 560, 562 (1979). The legislature specified its intent concerning residential facilities in the Act. It declared:

Section 1. Legislative intent

It is the public policy of this state that the state:

1. Provide, subject to available funds, a wide variety of services to mentally retarded persons admitted to state-operated services or programs which respond to the differing needs and abilities of such persons.

. . . .

Section 40. Legislative findings and intent

A. The legislature finds and declares that the health and welfare of the state requires that community-based housing programs for mentally retarded persons should be expanded and should be the foundation of the state's mental retardation residential program. The legislature finds that because of the extreme difficulties in locating such housing programs in residential communities in other states, because of the necessity that this type of housing program be established in Arizona on a state-wide basis, and because of the diversities in Arizona's municipal zoning ordinances, that minimum statewide standards are required to permit this type of housing to be established in residential communities in this state.

The expansive language of the Act carries forth this intent. For example, A.R.S. § 36–551.01 provides:

A. No developmentally disabled person in this state shall be denied as the result of such developmental disability the rights, benefits, and privileges guaranteed by the Constitution and the laws of the United States and the Constitution and laws of the state of Arizona. The rights of developmentally disabled persons which are specifically enumerated in this chapter are in addition to all other rights enjoyed by such persons.

. . . .

C. Every developmental [sic] disabled person who is provided residential care by the state shall have the right to live in the least restrictive alternative....

. . . .

F. No owner, lessee, sublessee, assignee, or managing agent of, or other person having the right to sell, rent or lease any real property or agency or employee

of such person may refuse to sell, rent or lease to any person or group of persons solely on the basis of developmental disability.

The Act speaks further to housing discrimination at A.R.S. § 36–582:

A. Unrelated persons living together notwithstanding, a residential facility which serves six or fewer persons shall be considered a residential use of property for the purposes of all local zoning ordinances....

B. For the purpose of all local ordinances, a residential facility which serves six or fewer persons shall not be included within the definition of any term which implies that the residential facility differs in any way from a single family residence.

....

E. A local ordinance which distinguishes, tends to distinguish, or has the effect of distinguishing residential facilities which serve six or fewer persons from single family dwellings shall be void and of no effect as applied to such facilities.

The legislative history and the language of the statutes demonstrate a strong public policy aimed at facilitating the state-wide integration of residential facilities into neighborhood communities. Section 36–582, read as a whole, clearly prohibits local governmental discrimination against residential facilities for the developmentally disabled.

We note that A.R.S. § 36–551.01 guarantees to all developmentally disabled persons in this state the rights, benefits and privileges guaranteed by the constitutions and laws of the United States and Arizona. These rights cannot be denied as the result of such disability. It is unclear, however, to what extent the legislature intended these statutes and the rights contained therein to control over contrary private covenants.[3]

Westwood argues that § 36–582(G), the only subsection which specifically addresses private covenants, limits the broad public policy favoring integration. That subsection states:

G. For the purposes of any contract, deed, or covenant for the transfer of real property *executed subsequent to the effective date of this section,* a residential facility which serves six or fewer persons shall be considered a residential use of property and a use of property by a single family, notwithstanding any disclaimers to the contrary. [Emphasis added]

Westwood contends that by specifically invalidating post–1978 covenants which prevent residential facilities from being considered single family uses, the subsection implicitly affirms the validity of pre–1978 covenants such as the one before us.

The trial court agreed, finding that the Act clearly provides for the orderly establishment and assimilation of these homes into the social fabric by expressly prohibiting enforcement of such deed restrictions *only* if they were entered into after December 1, 1978, the Act's effective date. The trial court reasoned that because these restrictive covenants were created in 1959, subsection (G) did not prohibit their enforcement.

By doing so, the trial court considered all restrictive covenants entered into prior to 1978 impregnable and fully enforceable. The appellants argue that this is not a conclusion mandated by subsection (G). They claim such an interpretation conflicts with numerous other provisions of the Act. Additionally, the appellants claim that this decision is contrary to overwhelming case law across the country, and that the trial court erroneously relied on the out-dated California decision of *Seaton v. Clifford,* 24 Cal.App.3d 46, 100 Cal.Rptr. 779 (1972).

Currently, four other states have enacted statutes restricting a property owner's ability to prevent the operation of a group home for the mentally retarded on or near

---

**3.** Guernsey, *The Mentally Retarded and Private Restrictive Covenants,* 25 Wm. & Mary L.Rev. 421 (1984).

his property.[4] Of these states, only California, like Arizona, appears to limit the applicability of the statute to prospective agreements. *See* Cal. Health & Safety Code § 1566.5 (West 1979).

The California Court of Appeals interpreted its similar subsection in *Welsch v. Goswick*, 130 Cal.App.3d 398, 181 Cal.Rptr. 703 (1982). That court held that even though the California Legislature expressly limited restrictive covenants entered into *after* 1978, this was not "a limitation upon the public policy articulated." *Id.* at 408, 181 Cal.Rptr. at 709. *See* p. 979 *ante*. The *Welsch* court went on to hold that the operation of a facility similar to the one here was no longer subject to prohibition by private covenant. *Id.* at 409, 181 Cal. Rptr. at 710.

■ We hold that any interpretation of subsection (G) which validates pre–1978 restrictive covenants is contrary to the public policy set forth by the entire Developmental Disability Act. The tail shall not wag the dog. We agree with the California court's reasoning concerning the specific date found in that subsection:

> Surely this additional act [of inserting a date] aimed at furthering the purposes of the Community Care Facilities Act should not be viewed by the courts as a limitation upon the public policy articulated.

*Welsch*, 130 Cal.App.3d at 408, 181 Cal. Rptr. at 709. That clause does no more than declare all residential facilities serving six or fewer persons to be single family uses. There is nothing in the legislative history to suggest that the 1978 date carried particular significance. Testimony was presented to the committee noting that group homes in Flagstaff and Phoenix as well as a statewide program under the direction of the Bureau of Mental Retardation and the Department of Economic Security *already* existed, thus predating this statute. Minutes of Senate Comm. on Health and Welfare (May 9, 1978). Clearly, the need for the group homes was already recognized, was already the public

policy of this state, and was simply articulated, by statute, in 1978.

In addition, limiting the effect of the Act to homes built after 1978 would allow certain landowners to prevent establishment of group homes in their neighborhoods, thereby blocking group homes in all neighborhoods built before 1978 with restrictive covenants such as the one at issue here. Many of these older neighborhoods are central city and most conveniently located near facilities most needed by the developmentally disabled. We believe this is an absurd result which would frustrate the stated purpose of the Act.

Westwood's argument that the public policy codified in the remainder of the Act extends only to zoning ordinances has been rejected by influential courts across the country.

The New York Court of Appeals reached this conclusion in *Crane Neck Ass'n. v. New York City/Long Island County*, 61 N.Y.2d 154, 460 N.E.2d 1336, 472 N.Y.S.2d 901, *cert. denied*, 469 U.S. 804, 105 S.Ct. 60, 83 L.Ed.2d 11 (1984). That court found that the group home violated the restrictive covenant limiting structures in the area to single family uses. Nevertheless, the court refused to enforce the covenant "because to do so would contravene a longstanding public policy favoring the establishment of such residences for the mentally disabled." *Id.* at 161, 460 N.E.2d at 1339, 472 N.Y.S.2d at 904. New York had also passed an act in 1978 setting forth procedures for establishing community residences and quashing resistance by local zoning authorities. Laws 1978, Ch. 468, codified in Mental Hygiene Law § 41.34. Subdivision (f) of that Act stated: "A community residence established pursuant to this section and family care homes shall be deemed a family unit, for purposes of local laws and ordinances." *Id.* at 164, 460 N.E. 2d at 1341, 472 N.Y.S.2d at 906. The New York court held that although the subdivision spoke only to "local laws and ordinances," it nonetheless

4. Cal.Health & Safety Code § 1501 *et seq.* (West 1979); Ind.Code § 16–10–2.1–6.8 (Burns Supp. 1983); N.C.Gen.Stat. § 168–23 (1982); Wis.Stat. Ann. § 46.03(22)(d) (West 1979).

reflects only the particular grounds that historically had been invoked to block placement of community residences, and not a deliberate substantive limitation by the Legislature. Private covenants restricting the use of property to single-family dwellings pose the same deterrent to the effective implementation of the State policy as the local laws and ordinances that had actually been the subject of the legal challenges. Given the avowed purpose of this law, we conclude that the Legislature did not enact subdivision (f) to erase the impediment resulting from single-family requirements found in laws and ordinances while leaving it intact in private covenants, and that the subdivision applies to such deed restrictions as well.

*Id.* at 165, 460 N.E.2d at 1341, 472 N.Y.S.2d at 907.

The evolving consensus that the public policy embodied in these statutes should be extended beyond zoning and over private restrictions is particularly well demonstrated by a line of cases decided by the Michigan Court of Appeals. In *Bellarmine Hills Ass'n v. Residential Sys.*, 84 Mich. App. 554, 269 N.W.2d 673 (1978), the court found that unrelated disabled persons living in a residential facility constituted a "family" and thus were permitted by the restrictive covenant. *Accord Leland Acres Home Owners Assoc. v. R.T. Partnership*, 106 Mich.App. 790, 308 N.W.2d 648 (1981). A few weeks later, a different panel rejected the same argument in *Jayno Heights Landowners Ass'n v. Preston*, 85 Mich. App. 443, 271 N.W.2d 268 (1978). That panel refused to extend beyond zoning legislation similar to Arizona's. Judge McGregor, in dissent, reasoned that the legislative intent was strong enough to find that "public policy favoring the establishment of residential adult foster care facilities outweighs the policy supporting the enforcement of residential restrictive covenants...." *Id.* at 448, 271 N.W.2d at 273.

Four years later, another panel decided *McMillan v. Iserman*, 120 Mich.App. 785, 327 N.W.2d 559 (1982). This time, the court agreed with Judge McGregor's dissent and found the covenant manifestly

against the public interest. It was unswayed by the argument that the statutes only addressed zoning restrictions. One judge dissented.

Finally, in 1984, a unanimous panel of the court of appeals struck a similar restrictive covenant as violative of public policy. The court reasoned developmentally disabled adults living in an adult foster care home were not within the covenant's definition of a "family." However, the court ruled the covenant unenforceable as applied to the group home on public policy grounds. *Craig v. Bossenbery*, 134 Mich. App. 543, 351 N.W.2d 596 (1984). *But see Shaver v. Hunter*, 626 S.W.2d 574 (Ct.App. Tex.1981), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 377, 74 L.Ed.2d 510 (1982) (suggesting that preferential treatment of handicapped would be violation of equal protection clause); *Omega Corp. v. Malloy*, 228 Va. 12, 319 S.E.2d 728 (1984), *cert denied*, 469 U.S. 1192, 105 S.Ct. 967, 83 L.Ed.2d 971 (1985) (legislation's effects should be limited to zoning).

We find nothing in the legislative history surrounding the Act to support Westwood's contention as well as the dissent herein that the legislature implicitly affirmed the validity of pre–1978 covenants by specifically invalidating post–1978 covenants. In fact, our research suggests the contrary is more likely.

Article 2, § 36–582, including subsection (G), was added by the Senate as an amendment to the original house bill and was approved without change by the conference committee. The minutes of the Senate Committee on Health and Welfare as it considered the bill show strong support for the amendment by several representatives, including MARC, for the developmentally disabled. It was seen unquestioningly by these representatives and committee members as a way to facilitate the much-needed integration of group homes into residential areas without changing the character of those neighborhoods. Contrary to Westwood's claim, the language in subsection (G) was not inserted in reaction to an expressed concern for the constitutional

rights of individual landowners. Indeed, such a concern, had it existed, would have been without foundation in the law. There is no unconstitutional retroactive impairment of contract rights where the legislation operates pursuant to a strong state interest, does not drastically alter the pre-enactment right and does not unreasonably destroy reliance on the right. *See* C. Hochmann, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv.L.Rev. 692 (1960). A single group home does not drastically alter the character of the neighborhood nor does it destroy the homeowners' expectation of a quiet residential neighborhood, the presumed goal of the covenants. *Sample v. Sample,* 135 Ariz. 599, 663 P.2d 591 (1983); *Painters District Council No. 3 Pension Fund v. Johnson,* 566 F.Supp. 592 (W.D.Mo.1983). Similarly, there is no compensable taking in a case such as this where the legislature can show that the action taken substantially advances a legitimate state purpose. *Nollan v. Cal. Coastal Comm'n,* — U.S. ——, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). As noted previously, the need for treatment and maintenance of the developmentally disabled is a legitimate and strong public interest, recognized by the legislature in the sweeping enactments at issue here. A legislative refusal to enforce restrictive covenants against otherwise unobtrusive group homes would substantially advance that interest by promoting the integration of the developmentally disabled into *all* neighborhoods of the community. As the United States Supreme Court recently stated: "We have long recognized that land use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land,' *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)." *Nollan v. Cal. Coastal Comm'n,* — U.S. at ——, 107 S.Ct. at 3146, 97 L.Ed.2d at 687.

We find the analysis in favor of extending the impact of this legislation beyond zoning to existing private covenants convincing. Private covenants pose the same barrier as local zoning ordinances. As Jus-

tice Marshall recently explained, "[e]xcluding group homes deprives the retarded of much of what makes for human freedom and fulfillment—the ability to form bonds and take part in the life of a community." *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 461, 105 S.Ct. 3249, 3266, 87 L.Ed. 2d 313, 334 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part). The Arizona Legislature has taken significant steps to facilitate this integration. It has defined the public policy relating to the developmentally disabled with absolute clarity notwithstanding the language in A.R.S. § 36–582(G).

Westwood's argument that Arizona recognizes an equally strong public policy of enforcing the private restrictive covenants of land owners does not dissuade us from our result. It cites *Tucson-North Town Home Apartments Homeowners Ass'n v. Robb,* 123 Ariz. 4, 596 P.2d 1176 (App. 1979), in which the homeowners association sued to enforce restrictive covenants prohibiting the defendant from putting evaporative cooling units in his windows. The court found the units violated the covenant and ordered them removed. *See also Carter v. Conroy,* 25 Ariz.App. 434, 544 P.2d 258 (1976) and *Pinetop Lakes Ass'n v. Hatch,* 135 Ariz. 196, 659 P.2d 1341 (App. 1983) (court would enforce restrictive covenant limiting use of trailers on residential lots). The importance, as specifically recognized by the legislature, of integrating society's disadvantaged human beings can hardly be analogized to placement of air-conditioning units and trailers on residential lots. Furthermore, our case law holds that restrictive covenants will be construed in favor of the free use of land unless devoid of ambiguity. *See Duffy v. Sunburst Farms East Mut. Water & Agric. Co.,* 124 Ariz. 413, 604 P.2d 1124 (1979); *Riley v. Stoves,* 22 Ariz.App. 223, 526 P.2d 747 (App.1974). Although restrictive covenants are a form of contract, *Divizio v. Kewin Enterprises,* 136 Ariz. 476, 666 P.2d 1085 (App.1983), they are not favored under the law because they restrict the free alienability of land. *Lacer v. Navajo County,* 141 Ariz. 396, 403, 687 P.2d

404, 411 (App.1983), Restatement of Property § 537 comment h (1936). The burden created by a restrictive covenant will only be enforced where there can be found a corresponding benefit. Restatement § 537 comment h. Westwood has failed to assert a corresponding benefit other than the bare interest in the freedom to contract. We believe this is insufficient because it does not operate to benefit the contracting party in the use of the land. *Id.* Given the strong interest in promoting the free use of land, we find that the freedom to contract, for whatever reason, and without more, cannot justify continuing the restrictive burden.

We do not believe our holding gives greater deference to the developmentally disabled than is warranted by existing legislation. Allowing the home in this case does not significantly alter the character of the neighborhood. The legislature has ensured against excessive concentration of such homes in any one community. *See* A.R.S. § 36–582(H) ("No residential facility shall be established within a twelve hundred foot radius of an existing residential facility in a residential area.") Although the use of the home as a residential facility may conflict with the words in the covenant, Westwood has not alleged any harm caused by the home that would justify thwarting the legislative purpose behind the Developmental Disabilities Act.

## CONCLUSION

We hold that an interpretation of subsection (G) of the statute which validates these pre–1978 covenants does not fit into the overall policy enunciated by the legislature and therefore cannot be enforced. We further hold that the public policy contained in the applicable statutes extends beyond zoning to prohibit private covenants from impeding the reasonable establishment of these residential facilities in residential neighborhoods. It is ordered reversing the judgment and remanding with directions to the trial court to enter summary judgment for the appellants. We need not reach the remaining evidentiary or equal protection issues.

## ATTORNEY'S FEES

█ The appellants have requested attorney's fees on appeal pursuant to *Pinetop Lakes Ass'n v. Hatch*, 135 Ariz. 196, 659 P.2d 1341 (App.1983). In our discretion we award attorney's fees to the appellants against Westwood in an amount to be determined following submission of a statement of costs in accordance with rule 21(c), Arizona Rules of Civil Appellate Procedure.

NOREEN SHARP, J. Pro Tem., concurs.

NOTE: Noreen Sharp was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. Art. VI, § 3 and A.R.S. §§ 12–145 to 12–147.

CONTRERAS, Judge, dissenting.

I dissent for the reason that in my opinion, the legislature in recognizing potential conflicts between two competing public policies resolved the conflict by affirming the validity of pre–1978 covenants restricting land use. I would therefore affirm the judgment.

The majority properly acknowledges that we are confronted with two competing public policies. At one end of the scale is the public policy of enforcing the private restrictive covenants of landowners. At the other end of the scale is the legislatively declared public policy of assisting the developmentally disabled by promoting their deinstitutionalization by the maintenance of such persons in a residential setting. The majority then decides, and I agree, that the facility in question violates the private restrictive covenant. The majority then proceeds to discuss the legislative intent in enacting the Developmental Disabilities Act and determines: "The legislative history and the language of the statutes demonstrate a strong public policy aimed at facilitating the state-wide integration of residential facilities into neighborhood communities." Again, I agree. The majority then finds it "... unclear, however, to what extent the legislature intended these statutes and the rights contained therein to control over contrary private covenants."

I disagree. In my opinion the state legislature specifically addressed this question with straight-forward clarity. A.R.S. § 36–582(G) provides:

G. For the purposes of any contract, deed, or covenant for the transfer of real property *executed subsequent to the effective date of this section* [December 1, 1978], a residential facility which serves six or fewer persons [with developmental disabilities] shall be considered a residential use of property and a use of property by a single family, notwithstanding any disclaimers to the contrary" (emphasis added).

The foregoing statutory language is simple and direct as is its logical interpretation. In essence, post–1978 covenants restricting land use to single-family residences cannot be enforced to exclude residential facilities for the developmentally disabled. By specifically invalidating post–1978 covenants that exclude residential facilities for the developmentally disabled, the statute implicitly affirms the validity of pre–1978 covenants. It may well be that the legislature in enacting A.R.S. § 36–582(G) as an integral part of this comprehensive legislation did so in order to obviate any constitutional challenges based on (1) retroactive impairment of vested rights, (2) impairment of contractual rights under article 1, § 10 of the United States Constitution and article 2, § 25 of the Arizona Constitution, or (3) the taking of property without just compensation under the fifth amendment to the United States Constitution and article 2, § 17 of the Arizona Constitution.

It can reasonably be concluded that, for whatever reason, the legislature clearly addressed the question of competing public policies and formulated an express methodology by which the two public policies were to interface. Otherwise, there would have been no need to include an effective date in A.R.S. § 36–582(G). If the legislature had intended to create a public policy that would prevent the enforcement of pre–1978 covenants as well as post–1978 covenants, it could have easily done so by excising from the statute the phrase "executed subsequent to the effective date of this section."

For the foregoing reasons, I cannot agree with the majority holding that "... any interpretation of subsection (G) which validates pre–1978 restrictive covenants is contrary to the public policy set forth by the entire Developmental Disability Act." Nor can I agree with the majority's second enunciated holding that "an interpretation of subsection (G) which validates these pre–1978 covenants does not fit into the overall policy enunciated by the legislature and therefore cannot be enforced." Rather, I conclude that the clearly stated language in subsection (G) demonstrates the legislature's intention in formulating overall public policy that pre–1978 private restrictive covenants are valid and enforceable. This was and remains a legislative decision which should not be judicially expanded in order to reach a desired result which is repugnant to the plain language of the statute and the intent of the legislature.

The majority cites and relies upon a number of cases from other jurisdictions in support of their position. However, these cases are readily distinguishable and only one of them, *Welsch v. Goswick*, 130 Cal. App.3d 398, 181 Cal.Rptr. 703 (1982), relies to any extent on a statute substantively identical to A.R.S. § 36–582(G). In *Welsch*, the deed restrictions limited subdivision use to "single-family residential purposes" and were recorded in 1955. The defendants purchased a lot in the subdivision in 1976 and prepared to use it as a residential care facility. The plaintiff sued to enjoin defendants' use of the property. The parties later stipulated to a judgment stating that defendants' use of the property violated the deed restriction and that they would be permanently enjoined from continuing such use. In 1978, California enacted article 7 of the Community Care Facilities Act. Section 1566.5 of that Act is substantively identical to A.R.S. § 36–582(G). The defendants in *Welsch* then instituted proceedings to dissolve the injunction but lost in the trial court which found that the newly enacted legislation did not affect the injunction. On appeal, the California Court

of Appeals, Fourth District reversed. The court first noted that the legislation did not apply to pre–1979 covenants but held that it represented a strong public policy favoring residential facilities. The court then concluded, for reasons which are not entirely clear, that the legislature's specific invalidation of post–1979 covenants should not be viewed by the courts as a limitation upon the public policy articulated. It is implicit from the majority decision in *Welsch*, that the court was of the opinion that the legislature's specific invalidation of post–1979 covenants did not imply that it did not also intend to extend the same public policy to invalidate pre–1979 covenants. There is extreme difficulty in attempting to reconcile the inconsistencies in the *Welsch* decision. The *Welsch* court appears to ignore the unambiguous language of the statute and then asserts, by judicial interpretation, provisions which were not included in the statute. It then proceeds to give retroactive effect to a statute which, on its face, is limited to prospective application. I therefore conclude that the majority in *Welsch* ignored clear statutory language in order to reach a desired result.

Although the overall objectives sought to be achieved by the Developmental Disabilities Act are quite commendable, I must conclude that the State Legislature, in view of the clear and unambiguous language set forth in A.R.S. § 36–582(G), intended that pre–1978 private restrictive covenants would be valid and enforceable. I would therefore affirm the decision of the trial court.