**Richmond**

THE OMEGA CORPORATION OF CHESTERFIELD

V.

D. DUANE MALLOY, ET AL.

Record No. 812080.

September 7, 1984.

Present: All the Justices.

*Donald E. King (Steven C. McCallum; McGuire, Woods & Battle*, on briefs), for appellant.

*N. Leslie Saunders, Jr. (Saunders & Pannell*, on brief), for appellees.

CARRICO, C.J., delivered the opinion of the Court.

This appeal involves a proposal to construct and operate group homes for the mentally retarded in subdivisions subject to restrictive covenants which limit uses to "residential purposes" and prohibit buildings other than "single-family" dwellings. The subdivisions in question are Providence Pines and Scottingham, both located in Chesterfield County.

The Omega Corporation of Chesterfield, a nonstock, nonprofit Virginia corporation (Omega), owns one lot in each subdivision. Omega proposed to build a dwelling on each lot "to provide mentally retarded adults with normal residential housing in a community setting including the activities and life-style incident to such a setting."

On June 12, 1981, D. Duane Malloy and his wife and other owners of lots in Providence Pines filed a bill of complaint seeking to restrain Omega from using its lot in the subdivision for a group home for the mentally retarded. On July 13, 1981, Robert Lee Cobb and his wife and other homeowners in Scottingham filed a bill of complaint seeking similar relief against Omega with respect to the lot it owned in that subdivision. (The plaintiffs in the two suits will be referred to collectively as Homeowners.) Both suits were based upon alleged violations of the subdivisions' restrictive covenants, which run with the land. The pertinent portions read as follows:

No lot shall be used except for residential purposes. No building shall be erected, altered, placed, or permitted to re-

main on any lot other than one detached single-family dwelling not to exceed two stories in height.[1]

The two suits were heard together on October 2, 1981, and taken under advisement by the chancellor. After the parties submitted memoranda, the chancellor issued a letter opinion declaring his intention to restrain Omega from using its lots for the group homes in question. On November 5, the chancellor entered permanent injunctions against Omega.

On November 18, 1981, Omega filed a petition with this Court seeking dissolution of the injunctions under Code § 8.01-626. We dismissed the petition and published an order stating that, because the injunctions were final judgments, the summary procedure authorized by Code § 8.01-626 was not the proper vehicle for seeking dissolution of the injunctions. *Omega Corp.* v. *Cobb*, 222 Va. 875, 292 S.E.2d 44 (1981). Omega then proceeded via the proper appeal route under Code § 8.01-670 and is here on an appeal awarded September 2, 1982.

The record shows that the Virginia Housing Development Authority has loaned Omega the funds to purchase the lots and has committed to lend the money to construct the group homes. The United States Department of Housing and Urban Development has approved the homes and has agreed to provide rent subsidies to those mentally retarded residents whose incomes qualify them for assistance. The residents would contribute one-fourth of their adjusted incomes toward rent.

The homes would be licensed by the Commonwealth, and the occupants would be supervised by counselors employed by the Chesterfield Mental Retardation Services. Three counselors would be assigned to each home on "rotation," with one counselor "there at all times."

Omega proposed to assign four mentally retarded adults to each home. Eligibility standards require each applicant for admission to be "a resident of Chesterfield County, eighteen years of age or older, and moderately mentally retarded."

Some of the prospective occupants are presently inmates of state institutions, but the majority live with their families or in "some other kind of situation." It is contemplated that, after staying in the group homes, some of the occupants would be "able to

---

[1] The Providence Pines restrictive covenant contains the additional phrase ". . . and an attached private garage for not more than two cars."

move out and go on . . . their own, and a few [would] go back into institutions, and the majority [would] stop at the group home level"; all are expected to remain two or three years, and "some may live in the homes for the rest of their lives."

On weekdays, the residents would leave the homes in early morning for work, vocational training, or "some [other] day activity," returning in late afternoon. Assisted by counselors, the occupants would spend their time at home cleaning house, cooking, and performing similar chores. Time at home would also be spent watching television, listening to music, and playing games. On weekends, the residents would go to the movies or on shopping or field trips, in addition to their usual leisure-time activities.

Aside from the assistance furnished by the counselors, no training of any kind would be provided the residents in the homes, and they would not receive any medical attention there. The residents and counselors would "function together as a single housekeeping unit." Except for the mental capacity of the occupants, the homes would operate like typical suburban households in "virtually all respects."

At trial, the developer of Providence Pines noted in his testimony the lack of any definition of the term "single-family" in the restrictive covenants in question. He then testified he had never interpreted the term to require that occupants of homes in the subdivision be related by blood or marriage and had never attempted to enforce "such a restriction." The developer of Scottingham testified to the same effect.

In his letter opinion, the chancellor stated:

> I believe that the restrictive covenants in question limit the use of the buildings to single family dwellings, as well as the type of construction. I believe that a single family dwelling means what it says. Only one family can inhabit the dwelling . . . . A single family use does not include occupancy by unrelated persons who live in the home with a counselor.

Omega disagrees with the chancellor's analysis of the covenants. Omega contends that the first sentence of the covenants creates a "use restriction," limiting the use of any lot to "residential purposes." The second sentence, Omega asserts, creates a "structural restriction," controlling the type of buildings that may

be constructed, not the type of persons who might choose to live in them.

There is "really no dispute," Omega says, that its use of the proposed dwellings would be residential; indeed, the evidence showed conclusively that the proposed use would be residential. Neither is there any dispute, Omega continues, that the proposed dwellings satisfy the single-family structural requirement of the restrictive covenants; in fact, the chancellor found that the architectural committees of both subdivisions had approved the structural plans for the buildings with full knowledge of the use Omega intended to make of its property.

Yet, Omega complains, instead of focusing on "the type of buildings to be constructed and whether they were to be used for residential purposes," the chancellor improperly focused on "the type of persons who would live in the buildings." As a result, Omega asserts, the chancellor incorrectly gave the "single-family dwelling" language both use and structural effect.

Virginia precedent, however, supports the dual effect the chancellor gave the "single-family dwelling" language. In *Schwarzschild* v. *Welborne*, 186 Va. 1052, 45 S.E.2d 152 (1947), the restrictive covenant under review provided that "there [should] not be erected more than two (2) dwellings" on the land conveyed. *Id.* at 1054, 45 S.E.2d at 153. Our opinion states:

> The defendant contends that this restriction applies to the kind of building to be erected and not to its use after it is erected. We do not think so. A covenant that prescribes the type of building to be erected necessarily limits the use that may be made of it after it is erected. A covenant to build only a dwelling would not be kept by building a dwelling and then using it as a grocery store or a funeral parlor.

*Id.* at 1057-58, 45 S.E.2d at 155.

Omega argues that *Schwarzschild* is inapposite because the case dealt only with the word "dwelling" in a restrictive covenant; no use was prescribed. Here, Omega says, the first sentence of the restrictive covenants limits use to "residential purposes," and it is improper to consider the term "single-family dwelling" in the second sentence as a further limitation upon use.

We disagree with Omega. The covenants must be read as a whole. *Friedberg* v. *Building Committee*, 218 Va. 659, 665, 239

S.E.2d 106, 110 (1977). When so read, the covenants specify that only dwellings designed structurally for single-family occupancy may be erected and that the buildings may be used only for single-family residential purposes.

Homeowners appear to concede that Omega's use of the buildings in question will be for residential purposes. This leaves for consideration, therefore, the question whether Omega's proposal to house mentally retarded persons in the buildings constitutes single-family use.

■ On this question, Omega cites *Schwarzschild* for the proposition that restrictive covenants are to be strictly construed against the parties seeking to enforce them and that they will be enforced only where the intention to limit the use of property is clear. In this case, Omega argues, there is nothing in the language of the restrictive covenants which makes clear that "persons unrelated by blood or marriage are to be excluded from the subdivisions"; further, the chancellor "found as fact that the intention of the developers was *not* to limit residency . . . to persons related by blood or marriage" (emphasis in original). Under these circumstances, Omega concludes, the chancellor's ruling that "the restrictive covenants prohibit persons unrelated by blood or marriage from living in the subdivision[s] is clearly wrong."

■ The difficulty with this argument is that the chancellor did not rule, as Omega claims, that the restrictive covenants in question prohibit persons unrelated by blood or marriage from living in the subdivisions. What the chancellor did rule is that "[a] single family use does not include occupancy by unrelated persons *who live in the home with a counselor*" (emphasis added).

There is a world of difference between Omega's interpretation of the chancellor's ruling and his actual holding. All the chancellor's holding means is that the single-family nature of a use is destroyed when the element of supervision by counselors is added to the occupancy of unrelated persons. The holding does not mean, as Omega suggests, that "three unrelated school teachers" cannot live together in the subdivisions or that the restrictive covenants prohibit "housekeepers, governesses, tutors, butlers, valets, and the like" from living with families in the subdivisions.

■ Even so, Omega declares, the chancellor's definition of the word "family" is unduly restrictive. The "commonly accepted" meaning of the word, Omega submits, is "[t]he collective body of persons who live in one house." Furthermore, Omega as-

serts, respectable judicial authority supports both a broader meaning of the word "family" and a recognition that homes for the mentally retarded do not violate single-family provisions of restrictive covenants. In this connection, Omega cites: *Malcolm* v. *Shamie*, 95 Mich. App. 132, 290 N.W.2d 101 (1980); *Bellarmine Hills* v. *Residential*, 84 Mich. App. 554, 269 N.W.2d 673 (1978);[2] *State, Etc.* v. *District Court, Etc.*, 609 P.2d 245 (Mont. 1980); *Hobby & Son* v. *Family Homes*, 302 N.C. 64, 274 S.E.2d 174 (1981); and *Crowley* v. *Knapp*, 94 Wis. 2d 421, 288 N.W.2d 815 (1980).

We agree with Omega that the word "family" should be interpreted broadly in favor of permitting the proposed use; this is the natural corollary of the rule that restrictive covenants must be construed strictly against those seeking to enforce them. The result sought by Omega, however, would require that we give an unrealistic meaning to the word "family."

The record shows that counselors who are public employees qualified by training and experience to handle handicapped persons would be present in the homes on a rotating basis "providing needed supervision" at all times, even while the residents of the homes are asleep. We can conceive of nothing more antithetical to the concept of family homelife than the constant surveillance of purported family members by government employees assigned to supervise them.

The presence of the counselors in the homes and their supervision of the occupants would convert what might otherwise have been a single-family use into what the chancellor termed "a facility." While the effort to provide "a facility" for the care of the mentally retarded is praiseworthy indeed, the fact remains that the use to which Omega wishes to put its property is institutional in nature and not familial.

Omega insists, however, that we cannot ignore the "many cases" from other jurisdictions in which homes for the mentally retarded have been held to satisfy the requirement of single-family

---

[2] Panels of the Court of Appeals of Michigan appear to be at odds with one another in this area of the law. In *Jayno Hts Ass'n* v. *Preston*, 85 Mich. App. 443, 271 N.W.2d 268 (1978), a panel held that the use of a dwelling as a home for elderly women was violative of a restrictive covenant limiting occupancy to "one single family unit." This, of course, differs from the holdings by other panels in *Malcolm* and *Bellarmine*.

provisions of zoning ordinances.[3] Omega also points to Virginia's public policy that mentally retarded persons "should not be excluded by county or municipal zoning ordinances from the benefits of normal residential surroundings." Code § 15.1-486.2. Omega then argues that this statement of public policy cannot be frustrated by the undefined term "single-family dwelling" in restrictive covenants.

We deal in this case, however, with private contractual rights arising from restrictive covenants, and not with provisions of zoning ordinances. The parties apparently interpret Chesterfield County's zoning ordinance to permit the group homes proposed by Omega; if this interpretation is correct, the ordinance would promote the public policy declared in Code § 15.1-486.2. But Chesterfield's zoning ordinance cannot relieve the lots in question from the restrictive covenants to which they are subject. *Ault* v. *Shipley*, 189 Va. 69, 75, 52 S.E.2d 56, 58 (1949). The zoning decisions cited by Omega, therefore, are inapposite.

For the reasons assigned, the judgments appealed from will be affirmed.[4]

*Affirmed.*

THOMAS, J., dissenting.

The restrictive covenant relied on by the Homeowners cannot be fairly read to prohibit the activity complained of. The majority opinion marks a sharp departure from the way in which the Court has traditionally looked at restrictive covenants; it misapplies *Schwarzschild* v. *Welborne*, 186 Va. 1052, 45 S.E.2d 152 (1947); and it creates a threadbare distinction between conduct that violates the covenant and conduct that does not. In my opinion, the conclusion reached by the majority is bad law which will prove unworkable.

---

[3] Omega cites the following cases: *Hessling* v. *Broomfield*, 193 Colo. 124, 563 P.2d 12 (1977); *Freeport* v. *Help of Children*, 94 Misc. 2d 1048, 406 N.Y.S.2d 221 (1977); and *Little Neck Assn.* v. *WORC*, 52 App. Div. 2d 90, 383 N.Y.S.2d 364 (1976).

[4] On brief, Omega argued that the chancellor's injunctions result in a denial of equal protection because they discriminate against unrelated persons and those who are mentally retarded. This point, however, was neither discussed nor expressly reserved at oral argument; hence, we consider the point waived. *Stevens* v. *Ford Motor Co.*, 226 Va. 415, 417 n., 309 S.E.2d 319, 320 n. (1983).

Traditionally, in Virginia, we have strictly construed restrictive covenants. *Lewis* v. *Henry*, 69 Va. (28 Gratt.) 192 (1877). Moreover, we have placed upon those who would enforce a restrictive covenant the burden of proving that the activity complained of falls within the terms of the restriction relied upon. *Schwarzschild*, 186 Va. at 1058, 45 S.E.2d at 155. In that same opinion, we stated that restrictive covenants are not favored in the law and that "[t]hey are to be construed most strictly against the grantor and persons seeking to enforce them, and substantial doubt or ambiguity is to be resolved in favor of the free use of property and against restrictions." *Id.* In addition to the foregoing, historically, we have focused upon the precise language used in the restriction without adding to or subtracting therefrom. Further, we have been careful not to imply that which was clearly stated. The majority opinion ignores these well-developed principles.

It would be difficult to imagine or to draft a restrictive covenant which more clearly sets forth a use restriction on the one hand and a structural restriction on the other. Both of the restrictive covenants considered in this appeal contained the following language:

> No lot shall be used except for residential purposes. No building shall be erected, altered, placed, or permitted to remain on any lot other than one detached single-family dwelling not to exceed two stories in height.

The first sentence contains the word "used." This means that where the drafter intended to limit use he knew exactly what to write in order to accomplish that result. The majority concedes that Omega's use of the property would comply with the residential use restriction contained in the first sentence.

Significantly, the second sentence makes no mention of "use" or "used." The second sentence does not mention those words because it is not concerned with use. It is concerned with the type of building to be constructed on the property. In every respect, the predicate of the second sentence makes unmistakably clear that the sentence pertains to the structure that may be placed upon the lot, not the use to which the structure may be put. The second sentence requires no more than that the structure erected on the lot be a dwelling and that that dwelling meet the following description: that it be *one* structure, that it be *detached*, that it be

*single-family*, and that it *not exceed two stories in height.* One can easily visualize a building that complies with these structural restrictions quite apart from any consideration of its use. Like the other descriptors in the list, "single-family" refers to a structural characteristic of a dwelling: one designed to accommodate a single cooperative living unit. In this sense, "single-family" is a shorthand reference for a type of design.* The majority concedes that the structure would comply with the restriction.

When the restrictive covenant is read as a whole, it is obviously a two-part restriction with the first part relating to use and the second part relating to structure. Nevertheless, the majority claims that by reading the covenant as a whole it finds a use restriction in the second sentence. What the majority has actually done is read language into the second sentence which cannot be found there. According to the majority, when read as a whole, "the covenants specify that only dwellings designed structurally for single-family occupancy may be erected and that the buildings may be used only for *single-family residential purposes.*" Ante, at 18 (emphasis added). The italicized language pinpoints the critical flaw in the majority opinion; that language cannot be found in the restrictive covenants here under review. That language was created and supplied by the majority. The majority's "reading" of the covenant can be more properly characterized as a re-write of that covenant. The majority's treatment of the restrictive covenant directly contravenes the rules this Court has evolved over the centuries concerning construction of restrictive covenants.

According to the majority, *Schwarzschild* v. *Welborne* justifies reading a use restriction into the second sentence of the covenant. In *Schwarzschild*, we said that the word "dwelling" when used by itself necessarily referred to both use and structure. However, in my view, the majority's reliance upon *Schwarzschild* is misplaced. The majority ignores the fact that there we struck down an attempt to restrict use of the subject property, while here *Schwarzschild* is relied upon to uphold a restriction. In essence, the majority attempts to utilize a portion of *Schwarzschild* while

---

\* An analogous short-hand reference appears in the Providence Pines restrictive covenant which contains the additional proviso that the lot owner may erect "an attached private garage for not more than two cars." No one would dispute that a "two-car garage" may be used for purposes other than housing cars. Surely this covenant would not be violated if a lot owner used such a garage to house a truck, a boat, two or more motorcycles, or even old newspapers.

distinguishing the great bulk of that opinion which runs counter to the majority's rationale.

Because of the central role *Schwarzschild* plays in the majority's analysis, that decision deserves detailed treatment. There, a homeowner sought to rent rooms in her house. Her deed contained a restrictive covenant which made two references to the word "dwelling." The deed said "there shall not be erected more than two dwellings" and "such improvements shall be a dwelling or two dwellings." 186 Va. at 1057, 45 S.E.2d at 154-55. The restrictive covenant in *Schwarzschild* was not comprised of a use component and a structural component. Instead, the restriction was embodied in one word: "dwelling." In trying to decide whether rentals could be permitted under the restriction, we rejected the argument that the word "dwelling" had no impact on the use to which the property could be put. We commented that in our view, it would be improper to build what looked like a dwelling then use it for a funeral home. Thus, we concluded that the word "dwelling," when used as it was in *Schwarzschild*, *"necessarily"* limited use. By contrast, in the instant appeal, there is no necessity to imply a use restriction. In this case, we need not fear that a building will be used for any thing other than a residential purpose. We do not need to imply a use restriction because one is stated explicitly.

The majority opinion is also disturbing because of the classification it develops. The majority states that it is willing to accept a broad definition of the word family. As result, the majority accepts as a single-family three unrelated school teachers who live together in a house, households containing maids, governesses, tutors, butlers and others. Indeed, the majority does not attempt to say what groups will be included in its broad definition of family. All it concludes is that four unrelated mentally retarded persons and a counselor do not fall within that broad definition. The explanation for the exclusion of the family group proposed by Omega is that the counselors will surveil and supervise the mentally retarded family members. The suggestion is that watching over and supervising individuals is somehow antithetical to the concept of family. In my view, watching over and supervising members of a family who need such attention is central to families. The majority's explanation for excluding from the definition of family a group made up of a counselor and four individuals is unsatisfactory. The majority has drawn a line which will exclude

appellants while including virtually everybody else. The facts and circumstances of this case do not support this result.

I would reverse the judgment of the trial court, and dissolve its injunction.