**DOUBLE D MANOR, INC. and Marjorie Rust, Petitioners,**

v.

**EVERGREEN MEADOWS HOME-OWNERS' ASSOCIATION, Lillian Pauline Miller, Robert Eugene Miller, William L. Weaver, Nancy Weaver, Theodore Ziegers, Marianne Ziegers, Coleman Gulley, and Mrs. Coleman Gulley, Respondents.**

No. 87SC246.

Supreme Court of Colorado,
En Banc.

April 24, 1989.

Holme Roberts & Owen, Edmond F. Noel, Jr., Katherine J. Peck, Denver, for petitioners.

Veto & Scott, Peter B. Scott, Lakewood, for respondents.

ROVIRA, Justice.

We granted certiorari to review the court of appeals' opinion in *Evergreen Meadows Homeowners' Association v. Double D Manor, Inc.*, 743 P.2d 39 (Colo.App.1987). The court of appeals affirmed the trial court's order which declared that Double D Manor (Double D) violated a restrictive covenant governing the use of the subject properties and granted a permanent injunction against the use of the properties as a group home for the developmentally disabled. We conclude that the proposed use of the premises does not violate the restrictive covenant in question. Therefore, we reverse.

I.

The facts material to an understanding of this case were stipulated to by the parties. The stipulation reflects that Double D is a Colorado nonprofit corporation whose purpose is to provide a "home life" situation for developmentally disabled persons between the ages of five and twenty-

one years. On September 1, 1984, Double D moved its staff and six developmentally disabled residents into a house on Lot 18 in the Evergreen Meadows subdivision (Subdivision), a residential community in Jefferson County, Colorado. After modification and enlargement of the septic system for the adjoining house on Lot 17, Double D located seven developmentally disabled persons there. The houses which Double D occupies are single-family dwelling structures. Double D has received a state license to operate these homes as "residential child care facilities" as defined in section 26–6–102(8), 11 C.R.S. (1982).

The residents of the homes are developmentally disabled children who are mildly or moderately emotionally disturbed. None of the children are legally or biologically related to any of the staff or employees of Double D. All meals are prepared, served, and consumed as a family unit. The various housekeeping chores are shared. The children attend public schools and participate in extracurricular activities at school. On occasion, the children go on recreational outings together.

Both homes are staffed by Double D employees. No employees permanently reside in one of the homes, and night supervision of the residents is provided by rotating staff members. A staff advocate is assigned to each resident. The staff advocate attends school functions and parent-teacher meetings with the child. The staff advocates, however, do not reside in the home with the children. The employees work in shifts and are responsible for the care of the residents and the operation and maintenance of the property. The employees consult outside professionals for the care of the children. The outside professionals do not treat the residents in the homes.

Less than a week after Double D began occupying one of the houses, several homeowners and residents of the Subdivision and the Evergreen Meadows Homeowners' Association (Association) commenced an action in the district court claiming that covenants contained in the deeds of all tracts of land within the subdivision precluded Double D's use of the property.

The covenants, which were recorded on the plat by the subdivider in 1969, and subsequently amended in 1978, provide that they are to run with the land and bind all parties claiming under them. The covenant, which, according to the Association, prohibits Double D's use of the subject properties, states:

> All sites shall be for residential use only, with only one single-family dwelling permitted on any site.

After considering the stipulated facts and the briefs submitted by the parties, the trial court concluded that, "as a matter of law, [Double D's] use of the property as a group home for the developmentally disabled is not in keeping with the contemplated residential nature of the neighborhood, and violates the restrictive covenants governing the use by [Double D] of their land." The court went on to find that "the plain and unambiguous purpose expressed in [the covenant quoted above] is to restrict the use of the property to a single family residence." It also found that, while a state licensed group home for eight developmentally disabled persons is a residential use of the property for zoning purposes, "such is distinguishable from a situation such as this where property owners are seeking to enforce the provisions of restrictive covenants which run with the land." The trial court enjoined Double D from using the houses as group homes for the developmentally disabled, but stayed enforcement pending appellate review.

In affirming the trial court's order, the court of appeals concluded that the language of the covenant is clear, and "[n]othing within that language would indicate an intent that it govern only architectural design to the exclusion of use." *Evergreen Meadows Homeowners' Ass'n v. Double D Manor, Inc.*, 743 P.2d 39, 40 (Colo.App. 1987). The court of appeals also concluded that the phrase "single-family dwelling" "would not include a group residence for the developmentally impaired lacking the characteristics of a normal and permanent

family unit maintaining the usual family-style living arrangement." *Id.* at 40.

Judge Tursi dissented, stating:

The covenant in this case is ambiguous since it is subject to two possible interpretations. The trial court followed one possible interpretation, finding "single-family" modified "residential use" such that the property could be used only for single-family residential purposes. However, the covenant can also be interpreted as two independent restrictions, a residential use restriction and a single-family structure restriction. I would adopt this second interpretation since it provides the least restriction on the use of the property.

*Id.* at 40–41 (Tursi, J., dissenting).

We granted certiorari on two issues: (1) whether the court of appeals erred in holding that a restrictive covenant which provides that "all sites shall be for residential use only, with only one single-family dwelling permitted on any site" constitutes both a usage restriction and a restriction on the type of structure; and (2) whether the court of appeals erred in holding that the phrase "single-family dwelling" excludes a group residence for developmentally impaired children.

## II.

 We first consider whether the phrase "single-family dwelling" constitutes a use restriction or only a structural restriction. To assist us in our task of interpretation, we look to section 38–34–103, 16A C.R.S. (1982), which provides in pertinent part: "Building restrictions and all restrictions as to the use or occupancy of real property shall be strictly construed...." Similarly, this court has stated the rule as follows: "[I]n construing a building restriction, all doubts must be resolved against the restriction and in favor of free and unrestricted use of property." *Flaks v. Wichman,* 128 Colo. 45, 48, 260 P.2d 737, 739 (1953). However, we have also recognized that this rule "has no application when the language is definite in its terms. One must follow the dictates of plain English." *D.C. Burns Realty &*

*Trust Co. v. Mack,* 168 Colo. 1, 4, 450 P.2d 75, 76 (1969).

The Association argues that the phrase "single-family dwelling" restricts the use of the properties to single families only. Double D contends that the phrase is ambiguous because it can be interpreted as a restriction on the type of use and structure permitted or a restriction only on the type of structure allowed; therefore, the phrase must be construed in the least restrictive manner. Based upon our interpretation, we conclude that the phrase "single-family dwelling" describes only the type of structure permitted on the property and not the type of use that can be made of the property.

This interpretation is apparent when each part of the covenant is examined. The word "dwelling" is the object of the preposition "with." The term "single-family" is an adjective modifying the noun "dwelling." The entire prepositional phrase beginning with "with" modifies the subject of the sentence "site." It does not modify "use," which is the object of the preceding preposition "for." The assertion that "single-family" modifies both "use" and "dwelling" is not consistent with a plain reading of the sentence. The covenant as written restricts only the type of structure to single-family dwellings.

To understand this conclusion, it is helpful to examine another covenant applicable to the Subdivision. That covenant provides in pertinent part: "Each site shall provide at least a two-car family, non-business, garage which may be separate or attached." It is clear that the term "two-car garage" describes only a structural restriction. The Association would not argue that it limits the use of the garage to only housing two cars. Likewise, the phrase "single-family dwelling" limits only the type of structure permitted on any site. *Cf. Omega Corp. v. Malloy,* 228 Va. 12, 319 S.E.2d 728, 733 note (1984) (Thomas, J., dissenting) (In a case involving a similar issue, the dissent points out in an unnumbered footnote that "[n]o one would dispute that a 'two-car garage' may be used for purposes other than housing cars.").

Other jurisdictions which have addressed similar questions have concluded that the phrase "single-family dwelling" is merely a structural restriction. *See, e.g., Clark v. Manuel,* 463 So.2d 1276, 1279 (La.1985); *Blevins v. Barry–Lawrence County Ass'n,* 707 S.W.2d 407, 410 (Mo.1986); *Knudtson v. Trainor,* 216 Neb. 653, 345 N.W.2d 4, 8 (1984); *Berger v. State,* 71 N.J. 206, 364 A.2d 993, 997 (1976); *J.T. Hobby & Son v. Family Homes,* 302 N.C. 64, 274 S.E.2d 174, 181–82 (1981); *Jackson v. Williams,* 714 P.2d 1017, 1021–22 (Okla.1985); *cf. Costley v. Caromin House, Inc.,* 313 N.W.2d 21, 26 (Minn.1981) ("The home meets the restriction of 'dwelling' whether we look at the express language or at cases involving group homes."); *Crowley v. Knapp,* 94 Wis.2d 421, 288 N.W.2d 815, 822–24 (1980) ("[T]he restrictive covenant in the present case did not define 'family' to be a group related by consanguinity or marriage.... We accordingly conclude that the occupancy of the home by the adult retarded residents did not violate the restrictive deed covenants.").

In *Blevins,* 707 S.W.2d 407 (Mo.1986), the Missouri Supreme Court considered the issue of whether a home for eight unrelated mentally retarded persons violated a restrictive covenant which provided:

> The aforesaid real property shall be used for residential purposes only. No buildings shall be erected, altered, placed or permitted to remain on said real property other than single or double family dwellings not to exceed two and one-half stories in height and private garages for not more than two cars....

*Id.* at 407. Homeowners who sued to enjoin the use of the property as a group home argued that the second sentence of the covenant was a restriction on the use of the property. In holding to the contrary, the court stated: "By its plain terms, however, this restriction applies only to structures and not to the use of the property." *Id.* at 410. This conclusion applies with equal force to this case.

The Association attempts to distinguish cases like *Blevins* on the basis that those cases involve restrictive covenants with two sentences whereas the covenant here is only one sentence long. This argument is unpersuasive. One sentence can express at the same time both a use restriction and a structural restriction. It is not necessary to divide the sentence into two clauses separated by a period in order to express the two types of restrictions.

The Association argues that Double D has violated the covenant because it believes that the general intent of the drafters of the covenant was to restrict the Subdivision to single-family residential use only. We disagree. The Supreme Court of Wisconsin responded to a similar argument, stating:

> That position is erroneous as a matter of law, because only the intent of the grantor as expressly set forth in the covenant is relevant.... [O]ne does not look to an amorphous general intent in determining the meaning of the restrictive words, but, instead, must look to the very words used....

*Crowley v. Knapp,* 94 Wis.2d 421, 288 N.W.2d 815, 823 n. 3 (1980). For the reasons stated in *Crowley,* we reject the Association's argument.

The Association, relying on *Lidke v. Martin,* 31 Colo.App. 40, 500 P.2d 1184 (1972), contends that the court of appeals has interpreted a covenant similar to the one in this case as providing for a single-family residential subdivision. In *Lidke,* residents of a housing subdivision sought to enjoin defendants from erecting two apartment buildings on a platted lot located in a subdivision. One of the subdivision's protective covenants provided:

> All lots in this subdivision shall be Residential One (R–1) only. No structure shall be erected ... on any lot other than one detached single-family dwelling not to exceed two and one-half stories in height, a private garage for not more than three cars, and other outbuildings incidental to residential use only.

*Id.* at 41–42, 500 P.2d at 1185. Defendants conceded that this covenant prevented the proposed construction. They argued, however, that another covenant which incorporated existing zoning laws permitted the

construction because the property had recently been rezoned to allow apartment buildings. In holding for the residents of the subdivision, the court of appeals stated:

> We do not agree with defendants that this clause allows a resident to make any use of his property permitted under applicable zoning regulations. Read as a whole, the protective covenants envision and provide for a single-family residential subdivision.... In this case, the new zone permitted the construction of apartment buildings. However, the covenants are controlling because they require a more restrictive use of the land than is permitted under the applicable zoning requirements.

*Id.* at 42–43, 500 P.2d at 1185. We interpret *Lidke* to mean that the covenant provided for a subdivision composed of single-family dwellings as opposed to multiple-family dwellings or apartment buildings. We do not believe that the language used by the court of appeals in *Lidke* means that the phrase "single-family dwelling" in the covenant at issue here should be defined as limiting the inhabitants of the Subdivision to only single families.

Finally, even if the phrase "single-family dwelling" were a use restriction, this court has held that a married couple and a maximum of six retarded children constitute a family under the terms of a city zoning ordinance in an area zoned for "one family dwellings." *Hessling v. City of Broomfield*, 193 Colo. 124, 563 P.2d 12 (1977).

In *Hessling*, the plaintiffs sought relief against the enforcement of a resolution of the Broomfield City Council permitting a residence to be used as a home for not more than six mentally retarded children in an area zoned for "one family dwellings." The ordinance defined the term "family" as: "An individual or two or more persons related by blood or marriage, or an unrelated group of not more than three persons living together in a dwelling unit." *Id.* at 126, 563 P.2d at 13.

In addressing the issue of whether a married couple and six retarded children, for whom the couple are surrogate parents, constitute a family under the provisions of the ordinance, we drew an analogy to adopted children and concluded:

> The only sensible construction is that the residence of a married couple and their six adopted children constitutes a one-family dwelling. We fail to see the distinction between adopted children and retarded children of tender age, so long as family characteristics are maintained.
>
> ... [T]o suggest that "families" composed of residents of group homes are to be distinguished from natural families in determining which single-family districts will be considered open to them, is to confuse the power to control physical use of premises with the power to distinguish among occupants making the same physical use of them.

*Id.* at 127–28, 563 P.2d at 14.

We conclude that the phrase "single-family dwelling" in the covenant at issue here is a structural restriction, and the structures in question do not violate that restriction.

### III.

Because we conclude that Double D's use of the properties does not violate the "single-family dwelling" language of the covenant, we must next decide whether Double D's use of the properties as a home for developmentally disabled children is a "residential use."

Although this court has not considered the meaning of the phrase "residential use" in a covenant in the context of a home for developmentally disabled residents, courts in other jurisdictions have held that a group home does not violate such a restriction. *See, e.g., Clark v. Manuel*, 463 So.2d 1276, 1279 (La.1985); *Blevins v. Barry–Lawrence County Ass'n*, 707 S.W.2d 407, 408 (Mo.1986); *Knudtson v. Trainor*, 216 Neb. 653, 345 N.W.2d 4, 6 (1984); *Berger v. State*, 71 N.J. 206, 364 A.2d 993, 998 (1976); *J.T. Hobby & Son v. Family Homes*, 302 N.C. 64, 274 S.E.2d 174, 180 (1981); *Jackson v. Williams*, 714 P.2d 1017, 1022 (Okla.1985).

In *Blevins*, 707 S.W.2d 407 (Mo.1986), the Missouri Supreme Court followed a defini-

tion of "residential purposes" which provided that a house used for such purposes is "one in which people reside or dwell, or [in] which they make their homes, as distinguished from one which is used for commercial or business purposes." *Id.* at 408 (quoting *Shepherd v. State,* 427 S.W.2d 382, 388 (Mo.1968)). In *Jackson,* 714 P.2d 1017 (Okla.1985), the Oklahoma Supreme Court stated that "[a]lthough the commercial nature of a group may have some relevance, that characteristic is not determinative in this case. It is the *purpose* and *method of operation* which serves to distinguish the proposed residential use of the home from that normally incident to a purely commercial operation." *Id.* at 1022 (emphasis in original). With these guidelines in mind, we turn to the facts of this case to determine whether Double D's use of the properties complies with the "residential use" requirement of the restrictive covenant.

Double D's stated purpose is to provide a "home life" situation for developmentally disabled children. To accomplish this goal, Double D organized homes with the following characteristics as set forth by Judge Tursi:

> The residents share bedrooms but have their own beds and dressers. They share the common areas of the house and the household chores. They eat together, family-style, with the children helping prepare meals. All the children attend Jefferson County public schools and are assigned a staff advocate to act as a surrogate parent. The children are permanent residents of Double D Manor until they reach the age of 21 or can move to a more self-sufficient environment. They are supervised 24 hours a day. The

residents function in the home much like residents of any other home.

*Evergreen Meadows,* 743 P.2d at 41 (Tursi, J., dissenting).

The Association argues that Double D uses the properties as a business based on the fact that Double D "earn[s] money to pay wages to its employees and other costs to maintain its operation." We disagree. Double D's receipt of funding and payment to its staff to supervise and care for the children do not transform the use of the facilities from residential to commercial.

We conclude that Double D's use of the properties in question does not violate the "residential use" requirement of the covenant at issue here.

## IV.

Finally, we believe the policy of this State as expressed by the Colorado General Assembly supports our conclusion. A movement toward deinstitutionalization of the mentally ill and the developmentally disabled began in the 1960's, and many states have enacted statutes in furtherance of this movement.[1] Consistent with this trend, the Colorado General Assembly has enacted legislation under which developmentally disabled individuals and others with special needs can live in homes in residential surroundings. *See, e.g.,* § 26–6–102(4), 11 C.R.S. (1982) (a "family care home" is a facility for child care in a place of residence of a family for the purpose of providing family care); § 26–6–102(8), 11 C.R.S. (1982) (a "residential child care facility" is a facility which provides 24–hour group care for five or more children); § 27–10.5–102(5), 11 C.R.S. (1988 Supp.) (a "community-based residential facility" is a building within which supervision, training, and housing

---

1. *See, e.g.,* Cal.Welf. & Inst.Code §§ 5115, 5116 (West 1984); Conn.Gen.Stat. § 8–3e (1989); Del. Code Ann. tit. 22, § 309 (1987); Idaho Code § 67–6531 (1980); Ind.Code Ann. § 16–13–21–12 (Burns Supp.1988); La.Rev.Stat.Ann. § 28:478 (West Supp.1989); Mo.Ann.Stat. § 89.020.2 (Vernon Supp.1989); Mont.Code Ann. § 76–2–412 (1987); Nev.Rev.Stat. § 278.021 (1986); N.J.Stat.Ann. § 40:55D–66.1 (West Supp. 1988); N.M.Stat.Ann. § 3–21–1(C) (Supp.1988); N.Y. Mental Hyg. Law § 41.34(f) (McKinney 1988); N.C.Gen.Stat. § 168–22 (1988); N.D.Cent. Code § 25–16–14(2) (Supp.1987); Or.Rev.Stat. § 443.600 (1987); R.I.Gen.Laws § 45–24–22 (1988); S.C.Code Ann. § 6–7–830(a) (Law.Co-op. Supp.1988); Tenn.Code Ann. § 13–24–102 (1987); Tex.Rev.Civ.Stat.Ann. art. 1011n (Vernon Supp.1989); Vt.Stat.Ann. tit. 24, § 4409(d) (Supp.1988); Va.Code Ann. § 15.1–486.2 (1981); Wash.Rev.Code Ann. § 49.60.224(1) (1987); W.Va.Code § 27–17–4 (1986).

are provided to no more than fifteen persons with developmental disabilities); § 27–10.5–133(a), 11 C.R.S. (1982) (a "community-based group home for the developmentally disabled" is a residence providing supervision, training, and housing for no more than ten developmentally disabled persons) (repealed effective July 1, 1985. Ch. 240, sec. 46, § 27–10.5–133, 1985 Colo. Sess.Laws 1016); §§ 30–28–115(2)(a), 12A C.R.S. (1982), and 31–23–303(2)(a), 12B C.R.S. (1982) (a state-licensed group home for eight developmentally disabled persons is declared to be a residential use of property for zoning purposes); §§ 30–28–115(2)(b.5), 12A C.R.S. (1988 Supp.), and 31–23–303(2)(b.5), 12B C.R.S. (1988 Supp.) (a state-licensed group home for eight persons with mental illness is a residential use of property for zoning purposes).

■ We believe the adoption of these statutory provisions reflects the desire, concern, and intent of the General Assembly to assist developmentally disabled individuals to live in normal residential surroundings. We also cannot help but be aware of the societal benefits to be gained by helping developmentally disabled children. The process of growing up to lead full and productive lives is enhanced by the opportunity to live in a normal residential setting with a group that approximates, as closely as possible, a traditional family.

Because Double D's use of the property does not violate the covenant, we reverse the judgment of the court of appeals affirming the order of the district court.

VOLLACK, J., does not participate.

ERICKSON, Justice, dissenting:

I respectfully dissent. In my view the trial court and court of appeals correctly concluded that the combination of the two residences operating in conjunction with each other had none of the "characteristics of a normal and permanent family unit." The protective covenants provided, in part:

1. All sites shall be for residential use only, with only one single-family dwelling permitted on any site.

2. No room or rooms in any residence may be rented or leased to any person. This shall not prevent the renting or leasing of an entire lot together with its improvements as a single unit to any person.

. . . .

20. The covenants shall run with the land, and shall bind all parties and all persons claiming under them until January 1, 1989, at which time they shall be automatically extended for successive ten-year periods; unless, by a vote of a majority of the then lot holders, said covenants are changed in whole or in part.

It is not disputed that two separate structures, approximately 150 feet apart, were used to house sixteen developmentally disabled children. The children ranged in age from five to twenty-one years, and Double D Manor, Inc. had a substantial staff to operate and supervise the two residences as a combined unit. The majority recognizes, in construing covenants restricting the use of land, that all doubt must be resolved against the restriction and in favor of the free and unrestricted use of the property. *Flaks v. Wichman,* 128 Colo. 45, 48, 260 P.2d 737, 739 (1953); *Greenbrier–Cloverdale Homeowners v. Baca,* 763 P.2d 1 (Colo.App.1988); *Shaver v. Hunter,* 626 S.W.2d 574 (Tex.App.1981). However, that general principal should not be applied in such a way as to defeat the clear intent and the plain and unambiguous purpose expressed in the restrictive covenants. *D.C. Burns Realty & Trust Co. v. Mack,* 168 Colo. 1, 450 P.2d 75 (1969); *Shaver,* 626 S.W.2d at 576.

I agree with the conclusion of both the trial court and the court of appeals that the clear intent and plain and unambiguous purpose of the framers of the protective covenants was to restrict the use of land to the traditional family-style use. I would decline to read the phrase "single-family dwelling" so narrowly as to define only a specific structure or type of building. The phrase also describes a particular use, namely, the traditional family-type residence. The covenant's intent is also evidenced by the second paragraph of the

covenants, prohibiting the rental of rooms. Because the term "single-family dwelling," in my view, describes a use as well as a structure, I cannot believe that the majority's interpretation of the restrictive covenants does not violate the spirit and clear intent of the covenants. *Omega Corporation of Chesterfield v. Malloy,* 228 Va. 12, 319 S.E.2d 728 (1984). I also agree with the trial court that although a state-licensed home for disabled persons is a residential property for zoning purposes, zoning laws do not override covenants running with the land when the covenants require a more restrictive use of the land than is permitted by the zoning provisions. *Lidke v. Martin,* 31 Colo.App. 40, 500 P.2d 1184 (1972).