CRAIG v BOSSENBERY

Docket No. 68499. Submitted December 19, 1983, at Detroit.—Decided
May 14, 1984. Leave to appeal applied for.

William E. Craig, Marie G. Craig, Duane D. Kuzak, and Martha
L. Kuzak, property owners in the Lake Oakland Woods Subdivi-
sion Number 3 in Independence Township, filed suit against
Patrick R. Bossenbery, who also owns property in the subdivi-
sion, and his lessee, Kay-Jan, Inc., which is licensed to provide
adult foster care and supervision to six or fewer mentally
retarded adults in a small group home, in Oakland Circuit
Court seeking to have a deed restriction enforced to exclude the
use of Bossenbery's property as an adult foster care facility.
Both plaintiffs and defendants filed motions for summary judg-
ment based on a stipulated statement of facts. The court, Hilda
R. Gage, J., granted summary judgment in favor of plaintiffs,
denied defendants' motion for summary judgment, and entered
an order declaring that the use of Bossenbery's property as an
adult foster care home for mentally retarded adults violated
the deed restriction and was, therefore, enjoined. Defendants
appeal. *Held:*

1. Although the term "family" as used in deed restrictions in
other cases has been interpreted broadly to allow group homes,
those cases involved deed restrictions in which the term "fam-
ily" was not defined. The property owners in the present case
prevented such interpretation by ascribing a fixed, unambigu-
ous definition to the term. Under that definition, the residents
of the Kay-Jan home do not constitute a family. Thus, if the
covenant is valid, defendants are precluded from operating
their home in the subdivision.

2. The restrictive covenant which, by its definition of "fam-
ily", bars the placement of a small group home for the continu-
ous care of six or fewer mentally retarded adults is unenforcea-
ble because it violates public policy.

Reversed, with summary judgment being entered in favor of
defendants.

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contracts § 240 *et seq.*

[2, 4] 20 Am Jur 2d, Covenants, Conditions, and Restrictions § 182.

[3] 20 Am Jur 2d, Covenants, Conditions, and Restrictions § 185 *et
seq.*

1. CONTRACTS — TERMS — JUDICIAL CONSTRUCTION.

Contractual terms are not subject to judicial interpretation unless they are ambiguous.

2. COVENANTS — RESTRICTIVE COVENANTS — PUBLIC POLICY.

There is a strong policy supporting the right of property owners to enforce the restrictions of covenants affecting their land.

3. COVENANTS — RESTRICTIVE COVENANTS — PUBLIC POLICY — FOSTER CARE FACILITIES.

The principle that restrictive covenants which violate public policy may not be enforced must be applied cautiously, but the public policy of Michigan to provide adequate, regulated, and safe adult foster care facilities in residential neighborhoods outweighs the policy supporting the enforcement of residential restrictive covenants which would impede the establishment of residential homes for adult foster care.

4. COVENANTS — RESTRICTIVE COVENANTS — FOSTER CARE FACILITIES — PUBLIC POLICY.

A restrictive covenant which, by its definition of "family", bars the placement of a small group home for the continuous care of six or fewer mentally retarded adults is unenforceable as being violative of public policy.

*Stern, Milmet, Vecchio, Goll & Carnago, P.C.* (by *Donald E. Schuster),* for plaintiffs.

*Garrett & Rogers, P.C.* (by *Jon R. Garrett),* for defendants.

Before: GRIBBS, P.J., and WAHLS and HOOD, JJ.

GRIBBS, P.J. This case of first impression involves a restriction on adult foster care facilities. The plaintiffs are property owners in the Lake Oakland Woods Subdivision Number 3 in Independence Township. A subdivision use restriction limits subdivision lots to single-family dwellings.[1] The

---

[1] The covenant states:

"Lots shall be used for residential purposes only and no building of any kind whatsoever shall be erected, re-erected, moved or maintained except private detached dwellings. Such dwellings shall be designed and erected for occupation by, and occupied by, only one (1)

defendants are a subdivision property owner, Patrick R. Bossenbery, and his lessee, Kay-Jan, Inc. Kay-Jan is licensed to provide adult foster care and supervision to six or fewer mentally retarded adults in a small group home. See MCL 400.701 *et seq.;* MSA 16.610(51) *et seq.* Kay-Jan is using Mr. Bossenbery's property as a small group home; this prompted the plaintiffs to sue to enjoin the use.

The Oakland County Circuit Court granted summary judgment for the plaintiffs and denied summary judgment for the defendants. The defendants appeal as of right.

The defendants argue that Michigan public policy considers a group of retarded citizens living together to be a "family", and thus the Kay-Jan home does not violate the restrictive covenant. Alternatively, they argue that public policy in Michigan strongly supports placing retarded citizens in normal community environments whenever possible and that this policy negates the covenant.

## I. DEFINING "FAMILY"

In other cases this Court has interpreted "family" in various restrictive covenants broadly to allow group homes. The Court in *Bellarmine Hills Ass'n v Residential Systems Co,* 84 Mich App 554; 269 NW2d 673 (1978), *lv den* 405 Mich 836 (1979), was faced with a covenant which allowed only

single family. A private garage or carport for the sole use of the owner or occupant may be provided. A family shall mean one person or a group of two or more persons living together and inter-related by bonds of consanguinity, marriage, or legal adoption. The persons thus constituting a family may also include foster children, gratuitous guests and domestic servants. The Declarant may permit the occupation of a dwelling by persons not constituting a family as defined herein provided it finds that such occupancy will not be detrimental to the purposes sought to be obtained by these restrictions."

"one single private family dwelling" per lot. *Bellermine,* p 557, fn 3. Relying on early Michigan Supreme Court cases,[2] the Court held that "family" included six or fewer mentally retarded children and their resident foster parent.

In *Malcolm v Shamie,* 95 Mich App 132; 290 NW2d 101 (1980), a similar covenant permitted only single-family dwellings. The Court, noting that the living arrangement was not a temporary one, held that "family" included five mentally retarded adult women living with a foster parent.

A restrictive covenant allowing only single private family dwellings was interpreted in *Leland Acres Homeowners Ass'n, Inc v R T Partnership,* 106 Mich App 790; 308 NW2d 648 (1981), to include six mentally disabled adults with 24-hour supervision as a "family".

Another panel applied the preceding cases to a home providing care for six or fewer mentally retarded adults in *Livonia v Dep't of Social Services,* 123 Mich App 1; 333 NW2d 151, *lv gtd* 418 Mich 874 (1983). That panel also interpreted "family" in a restrictive covenant liberally to include the residents of a small group home.

A related case allowed a woman to operate a family day care home in a residential neighborhood. *Beverly Island Ass'n v Zinger,* 113 Mich App 322; 317 NW2d 611 (1982). The *Beverly Island* case, however, is distinguishable from the other covenant cases. In *Beverly Island* the Court was interpreting language in a covenant which provided that "no lot or building plot shall be used

---

[2] *McDonald v Kelly Coal Co,* 335 Mich 325; 55 NW2d 851 (1952); *Boston-Edison Protective Ass'n v Paulist Fathers, Inc,* 306 Mich 253; 10 NW2d 847 (1943); *Carmichael v Northwestern Mutual Benefit Ass'n of Michigan,* 51 Mich 494; 16 NW 871 (1883); *Mutual Benefit Ass'n of Michigan v Hoyt,* 46 Mich 473; 9 NW 497 (1881). See 84 Mich App 559-561.

except for residential purposes". 113 Mich App 324. The Court's opinion addressed only the meaning of "residential purposes" and did not involve the definition of "family". 113 Mich App 331.[3]

To date, only one case from this Court has contradicted the preceding set of cases. In *Jayno Heights Landowners Ass'n v Preston,* 84 Mich App 443; 271 NW2d 268 (1978), *lv den* 405 Mich 828 (1979), this Court ruled that "family" did not include six elderly residents of a group home. Judge McGREGOR dissented, stating that he would follow the holding of *Bellarmine Hills* and liberally interpret "family". 85 Mich App 449, 452.

Other panels have attempted to harmonize the differing results of *Bellarmine Hills* and *Jayno Heights.* The Court in *Malcolm v Shamie, supra,* correctly pointed out that *Jayno Heights* involved a commercial venture while the organization in *Bellarmine Hills* was a government-subsidized non-profit corporation. 95 Mich App 135. See also *Leland Acres,* 106 Mich App 796.

The *Malcolm* Court also attempted to distinguish *Jayno Heights* by saying that *Bellarmine Hills* involved the kind of structure which could be constructed while *Jayno Heights* involved the kind of structure which could be built *and occupied.* 95 Mich App 134-135. We believe this is a point without distinction. As Judge BASHARA noted in the *Bellarmine Hills* opinion, "[w]here restrictive covenants describe the character of permissible structures to be erected upon the property, they also contemplate that use and occupancy of the

---

[3] The *Beverly Island* Court briefly discussed *Bellarmine Hills* and *Jayno Heights Landowners Ass'n v Preston,* 85 Mich App 443; 271 NW2d 268 (1978), *lv den* 405 Mich 828 (1979), but did not specifically apply the definition of "family" to its own facts. Instead, the Court's recognition of these two cases was tied to its discussion of public policy. 113 Mich App 328-329.

property shall be commensurately restricted". 84 Mich App 559.

The defendants argue that the foregoing cases (with the exception of *Jayno Heights)* demonstrate that the Michigan courts have, for public policy reasons, defined "family" to include residents of licensed foster care facilities.[4] Although there is merit in the defendants' public policy argument, we think the key element of the above cases was the absence of any definition of "family" in the various covenants. As such, there was an ambiguity open to judicial interpretation. See *McMillan v Iserman,* 120 Mich App 785, 802; 327 NW2d 559 (1982) (MacKenzie, J., *dissenting).*

Our case does not present an ambiguous term. Instead, "family" is clearly defined in the covenant:

"A family shall mean one person or a group of two or more persons living together and interrelated by bonds of consanguinity, marriage, or legal adoption. The persons thus constituting a family may also include foster children, gratuitous guests and domestic servants."

Covenants are contracts. 20 Am Jur 2d, Covenants, Conditions, and Restrictions, § 1, p 575. Contractual terms are not subject to judicial interpretation unless they are ambiguous. *Id.,* § 185, pp 752-753. Although "family" may be assigned many "flexible" meanings, see *Boston-Edison Protective Ass'n v Paulist Fathers, Inc,* 306 Mich 253, 259; 10 NW2d 847 (1943), the property owners here have prevented flexibility by ascribing a fixed, unambiguous definition. The residents of the Kay-Jan home do not fit within the covenant's definition of "family". If the covenant is valid, the defendants are

---

[4] See the Adult Foster Care Facility Licensing Act, 1979 PA 218, MCL 400.701 *et seq.;* MSA 16.610(51) *et seq.*

precluded from operating their group home in the subdivision. We now turn to the validity of the covenant.

## II. PUBLIC POLICY

There is a strong policy supporting the right of property owners to enforce the restrictions of covenants affecting their land. *Wood v Blancke,* 304 Mich 283, 287-288; 8 NW2d 67 (1943). We will not, however, enforce contracts which violate public policy:

> "If the contract is at war with the established interests of society, and is in conflict with the morals of the time, the fact that individuals may suffer can in no manner affect the question, as the interests of individuals must in many cases be subservient to public welfare." *McNamara v Gargett,* 68 Mich 454, 461; 36 NW 218 (1888).

See *Oosterhouse v Brummel,* 343 Mich 283; 72 NW2d 6 (1955) (restrictive covenants).

The policy supporting community placement of the mentally retarded is very strong. Recognizing the modern development of physical and mental rehabilitation beyond institutional treatment, the 1963 Constitutional Convention revised the narrow language of the 1908 Constitution.[5] See Const 1963, art 8, § 8, Convention Comment. The 1963 Constitution provides:

> "Institutions, programs and services for the care, treatment, education or rehabilitation of those inhabitants who are physically, mentally or otherwise seri-

---

[5] "Institutions for the benefit of those inhabitants who are deaf, dumb, blind, feeble-minded or insane shall always be fostered and supported." Const 1908, art 11, § 15.

ously handicapped shall always be fostered and supported." Const 1963, art 8, § 8.

The Michigan Legislature has affirmatively fostered and supported institutions, programs, and services for the handicapped. The handicapped have special needs which must be served, yet the Legislature has determined that mainstreaming—bringing the handicapped back into the community where they can live more "normalized" lives —is a worthy goal. To support this goal the Legislature has enacted the now-repealed mandatory special education act, 1971 PA 198; §§ 708 and 712 of the Mental Health Code, 1974 PA 258, MCL 330.1708, 330.1712; MSA 14.800(708), 14.800(712), the Michigan Handicappers' Civil Rights Act, 1976 PA 220, MCL 37.1101 *et seq.;* MSA 3.550(101) *et seq.,* and the 1977 amendments to the Township Rural Zoning Act, 1977 PA 29, MCL 125.286a; MSA 5.2963(16a), and the County Rural Zoning Enabling Act, 1977 PA 30, MCL 125.216a; MSA 5.2961(16a). Most important is the Adult Foster Care Facility Licensing Act, 1972 PA 287, as amended by 1979 PA 218, MCL 400.701 *et seq.;* MSA 16.610(51) *et seq.* This statute provides for community placement when such placement is appropriate and institutionalization is not beneficial.

Judicial decisions based on the Adult Foster Care Facility Licensing Act, with the exception of *Jayno Heights,* have been supportive of the rights of the handicapped. The statute was upheld against various constitutional and zoning challenges in *Canton Charter Twp v Dep't of Social Services,* 128 Mich App 505; 340 NW2d 306 (1983); *Greentrees Civic Ass'n v Pignatiello,* 123 Mich App 767; 333 NW2d 350 (1983), *lv gtd* 418 Mich 880 (1983); *Livonia v Dep't of Social Services,* 123

Mich App 1; 333 NW2d 151 (1983) *(Livonia II), lv gtd* 418 Mich 874 (1983); *Dearborn v Dep't of Social Services,* 120 Mich App 125; 327 NW2d 419 (1982), *lv den* 417 Mich 1078 (1983); *Oxford Twp v Dep't of Social Services,* 120 Mich App 103; 327 NW2d 409 (1982); *Livonia v Dep't of Social Services,* 119 Mich App 806; 328 NW2d 1 (1982) *(Livonia I), lv gtd* 418 Mich 874 (1983), and *Brandon Twp v North-Oakland Residential Services, Inc,* 110 Mich App 300; 312 NW2d 238 (1981), *lv den* 412 Mich 900 (1982).

Cases in which community placement was upheld against attacks by property owners seeking to enforce restrictive covenants were discussed in the preceding section.

Several cases are noteworthy for their discussions of public policy. The *Bellarmine Hills* Court recognized that "[t]he associational nexus of the group [the residents] clearly occupies a favored position in our state's public policy". 84 Mich App 562. Referring to day care homes for mentally retarded children, the Court in *Beverly Island* stated: "Unquestionably, the public policy of this state is to provide for the protection, growth and development of the children." 113 Mich App 330. The "public policy of this state to establish community housing for the handicapped" was recognized in dicta in *Livonia II,* 123 Mich App 22.

Judge McGREGOR, dissenting in *Jayno Heights,* eloquently summarized our view of the public policy supporting the placement of small group homes in residential settings:

"It is apparent from the above-cited constitutional and statutory language that *it is the confirmed public policy of this state to provide adequate, regulated and safe foster care facilities for the elderly in residential neighborhoods throughout the state.* The Legislature's

use of a six person limitation in § 5 of the Adult Foster Care Facility Licensing Act reveals *its intent to promote facilities of a small, familial nature.* That the Legislature intended that such facilities be located in residential communities is beyond question in light of § 8's prohibition of excessive concentrations of such facilities in any given community. And, while MCL 125.286a; MSA 5.2963(16a) deems such facilities the residential use of property for the purposes of zoning without mentioning restrictive covenants, this law reiterates the public policy favoring the establishment of such facilities.

"In applying with the utmost caution the principle that restrictive covenants which violate public policy may not be enforced, I would find that the public policy favoring the establishment of residential adult foster care facilities outweighs the policy supporting the enforcement of residential restrictive covenants and that the covenant in question may not be enforced to enjoin defendants' use of this property as a licensed foster care facility." (Emphasis added.) 85 Mich App 454-455.

In *McMillan v Iserman, supra,* this Court ruled unenforceable as a violation of public policy an amended covenant which expressly barred state-licensed residential facilities (group homes) from the subdivision.[6] This blatant attempt to exclude the mentally handicapped from the neighborhood

---

[6] Part of the covenant in *McMillan* stated:

"No lot may be used for the operation of any state licensed residential facility, as that term is defined by Sections 125.216a, 125.286a and 125.583b of the Michigan Compiled Laws on January 1, 1980, such laws being more commonly referred to as MCLA Sections 125.216a, 125.286a and 125.583b. This restriction is to be liberally construed and is meant to exclude the operation of any State of Michigan-licensed facility that provides resident services for six (6) or less persons under 24-hour supervision or care for persons in need of that supervision or care, whether such residential facility is licensed pursuant to Public Act 287 of 1972, as amended, Public Act 218 of 1979, as amended, or pursuant to any Public Act of the State of Michigan that may be adopted in the future which supersedes or amends Public Act 287 of 1972 or Public Act 218 of 1979 in any way." 120 Mich App 796.

was held "manifestly against the public interest and thus unenforceable on public policy grounds". 120 Mich App 795.

In our case, the plaintiffs have not attempted so blatant an exclusion as the plaintiffs in *McMillan.* The restrictive covenant we consider pre-dates the current controversy surrounding mainstreaming, whereas the *McMillan* covenant was written in direct response to the statute to specifically exclude group homes. We attribute no ill motive to our plaintiffs. Nevertheless, the public policies are the same.

The strong public policy supporting group homes overcomes the public policy which favors the right of property owners to create restrictive covenants. We cannot consider the property owners' apparent motives in drafting or retaining a covenant lest we encourage indirect methods to exclude the handicapped where blatant, direct methods would clearly fail.

Thus, we hold the restrictive covenant which, by its definition of "family", bars the placement of a small group home for the continuous care of six or fewer mentally retarded adults is unenforceable as violative of public policy. We are *not* striking down the covenant in its entirety. The Lake Oakland Woods Subdivision Number 3 has a recognized right to maintain the single-family atmosphere by defining "family". As applied to the residents of the defendants' small group home, however, the covenant is unenforceable.

## III. EQUAL PROTECTION

In light of our disposition of the public policy issue, we do not reach the defendants' argument that enforcement of the covenant violates the

Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Summary judgment for the plaintiffs is reversed. The trial court's denial of summary judgment for the defendants is reversed, and summary judgment is entered for the defendants.