DEEP EAST TEXAS REGIONAL MENTAL HEALTH AND MENTAL RETARDATION SERVICES, Appellant,

v.

Joe Bruce KINNEAR, et al., Appellees.

No. 09–93–316 CV.

Court of Appeals of Texas, Beaumont.

Submitted May 5, 1994.

Decided June 9, 1994.

---

Wayne D. Haglund, Robin B. Phillips, Cassels, Haglund & Clark, Lufkin, for appellant.

T. Alan Hart, Jasper, for appellees.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

This appeal follows the granting of a temporary and permanent injunction in favor of appellees against the appellant, Deep East Texas Regional Mental Health Mental Retardation Services (DET), prohibiting DET from constructing a community home in a certain subdivision. DET proposed to build an architecturally correct structure wherein six female citizens of Texas with mental impairment would reside and would be supervised and carefully regulated by two staff members. The supervision would be on a 24-hour, seven-day week basis. This appeal as presented and argued involves certain Federal and State constitutional questions, as well as several Federal and State statutes. Kinnear filed four original and amended petitions using the wording "Kinnear, et al". The phrase "et al" implies other plaintiffs. None were named.

### Part I—The Restrictive Covenants Issues

DET briefs, argues and presents points of error ten and eleven together; this grouping is logical and proper. Point of

error ten complains that the trial court erred in finding the restrictive covenants forbade DET's intended use of its lots in the Bay Meadows Subdivision. In point of error eleven, DET challenges the trial court's conclusion that the proposed home would not as a structure constitute a single family *residence* and thereby a violation of certain restrictive covenants would result. We agree; DET's points of error ten and eleven are sustained.

The relevant restrictions are:

1. All lots shall be known and described as lots for residential purposes only. Only one one-family residence may be erected, altered, placed or be permitted to remain on any lot. Said lots shall not be used for business purposes or any kind nor for any commercial, manufacturing or apartment house purposes.

. . . .

3. No noxious or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood.

We conclude that the trial court erred in finding that the proposed structure would violate the restrictive covenants of Bay Meadows. The restrictive covenants as noted above restrict the architectural form of the structure. However, such restrictions do not address the use to which the proposed residence is put. *See, Permian Basin Centers v. Alsobrook*, 723 S.W.2d 774 (Tex. App.—El Paso 1986, writ ref'd n.r.e.); *Collins v. City of El Campo*, 684 S.W.2d 756 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.).

In *Permian Basin Centers*, the unanimous El Paso Court of Appeals held that such a term as single family dwelling deals with the character of the structure that may be erected, altered, or placed or permitted to remain on any residential building plot. This term does not refer to the use to be made of the structure. The restriction in our case, since it speaks of erection, alteration, and placement on a plot definitely refers to *structures*. There is obviously no mention of any type of restriction or covenant that seeks to impose an actual single family *occupancy* within the structure. The lots are permitted to be used

for residential purposes. DET satisfies the residential requirement.

■ Thus, it is now the established law in our state that the term "single family residence" refers to the architectural character and the architectural form of the structure that may be built, not the use which may be made of the structure. By necessary, logical reasoning, the term "single family residence" deals with the design or form of the residence in an architectural, structural sense. This is the correct interpretation inasmuch as the restriction itself is explained and limited by its wording: "Only one one-family residence may be erected, altered, placed or be permitted to remain on any lot." Note that a separate provision deals with the use, reading: "Said lots shall not be used for business purposes of any kind nor for any commercial, manufacturing or apartment house purposes." This first restriction has to do with the construction and building and erection of the architectural structure. Indeed, the only meaningful "use" provisions in the restrictions merely distinguish between business, commercial uses on the one hand and residential uses on the other. Residential uses are not prohibited and under this record there is no evidence or legal basis for holding that the community home or family home to be built would be either business or commercial. *See, Permian Basin Centers, supra; Collins v. City of El Campo, supra.*

■ It is well established that if a restrictive covenant is susceptible of two reasonable interpretations or if the wording is not entirely clear, stringent, and limiting; then, any doubt must be resolved in favor of freer use and against restrictions. *Southampton Civic Club v. Couch*, 159 Tex. 464, 322 S.W.2d 516 (1959). Restrictive clauses must be stringently and rigorously construed, favoring the grantee; and any doubt and all doubt must be resolved in favor of the autarchical use of property. *Id.*

In *Permian Basin Centers*, for example, the court found that the erection of a residential structure or home for six unrelated mentally retarded adults and two staff persons or, in the alternative, two house parents, did not violate covenants which disallowed all

but single family dwellings. Again, the El Paso court determined that the restrictions limited only the character of the structure or the architectural type of house that would be permitted. Inasmuch as the proposed DET structure is to be used for residential purposes, there is no violation of the restrictive covenant.

Appellees place major reliance on *Shaver v. Hunter*, 626 S.W.2d 574 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 377, 74 L.Ed.2d 510 (1982). *Shaver* is different and meaningfully distinguishable from this case on appeal. The restrictive covenants have different wording and dissimilar language and meaning. In *Shaver*, there was a mixture of the use restrictions and the structural or architectural restrictions. Such a mixture is absent here. Indisputably, here, the proposed house was designed as a single family residence—as opposed, for example, to duplexes or apartment buildings.

A cardinal purpose of the remedial, rehabilitative statutes (noted below) is to surround the citizens of Texas who suffer from mental impairment with a residential, family structure in his or her own familiar community. In *Collins, supra*, as we have noted above, the court held that the term "single family dwelling" in the restrictive covenants, did not require occupancy by a single family, and did, indeed, permit use of the property as a family home or community home for four unrelated, mentally retarded men inasmuch as the structure was architecturally designed as a single family residence. *See Collins, supra*, 684 S.W.2d at 761, 762. We sustain DET's points ten and eleven.

■ Appellant's points of error fifteen and sixteen aver the trial court erred in finding that the proposed community home of DET would constitute an annoyance and a nuisance and therefore would be a violation of the restrictions of Bay Meadows. As we read the record, there has been no construction on the land. No earthwork has been started. No foundation work has been commenced. No structure has been initiated. But the trial court held that, nevertheless, Deep East Texas' construction and future operation of the proposed community home

would constitute both an annoyance and a nuisance. There is no evidence to sustain these rulings and findings. We have assiduously adhered to the established standards of appellate review, pursuant to the following landmark authorities: *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX.L.REV. 361 (1960); St. John Garwood, *The Question of Insufficient Evidence on Appeal*, 30 TEX. L.REV. 803 (1952). We sustain appellant's point of error number fifteen.

■ By like reasoning we sustain appellant's point of error sixteen. As to point of error sixteen, the trial court held that a future building constituted an annoyance and a nuisance. Under established rules of law in our State, a "nuisance per se" is an act, structure or an occupation that is a nuisance at all times and under any and all circumstances and located at any location. *See City of Sundown v. Shewmake*, 691 S.W.2d 57 (Tex.App.—Amarillo 1985, no writ). No evidence exists in this record to prove a "nuisance per se".

■ A "nuisance in fact", on the other hand, is a fact situation or determination of an actual nuisance which depends on the facts of each particular case. Before it is proper to enjoin the construction of a house or building, the record must clearly establish that the proposed use or activity therein will necessarily create a nuisance. The mere speculative, future prospect of some type of future annoyance or injury from a structure to be built in the future is simply not a valid ground for the issuance of an injunction. *McAshan v. River Oaks Country Club*, 646 S.W.2d 516 (Tex.App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.); *Schulman v. City of Houston*, 406 S.W.2d 219 (Tex.Civ.App.—Tyler 1966, writ ref'd n.r.e.).

In *Schulman*, the court reaffirmed the established rule that injunctive relief will be denied where the threatened or anticipated act or acts complained of may or may not become in the future a nuisance. Under equity practice in this State an injunction will not lie to prevent an alleged threatened act

or acts, the commission of which is speculative and the alleged injuries from which are conjectural.

Nor will injunctive relief lie to prevent an anticipated act or acts. *Thomas v. Bunch,* 41 S.W.2d 359 (Tex.Civ.App.—Fort Worth 1931), *aff'd* 121 Tex. 225, 49 S.W.2d 421 (1932).

Thus, we are constrained to hold that the injunctions were not properly issued before any preliminary, preparatory work was commenced and before any type of construction and before the operation of a facility or a structure where the plaintiffs only fear that some type of nuisance may be created in the future. We have determined that the structure is not a nuisance per se. Hence, the construction of this house cannot be restrained and enjoined unless the evidence proves that the use thereof will necessarily create a nuisance. The record in this case fails to demonstrate that a nuisance will necessarily and inevitably be created.

■ Great and in depth caution must be exercised when interfering with a structure to be built in the future which structure would have in the future a public purpose. It will not suffice to show a problem or contingent injury or nuisance. The record must show that the alleged results will be inevitable and undoubted. The fact that a structure or activity which is lawful and in harmony with the State's public policy may in the future become objectionable after it has been commenced and completed is not a ground for enjoining the erection of the structure. A chancellor setting in equity will not restrain a lawful structure until it be clearly proved that the alleged detriments and evils are both imminent and certain to occur. *Robinson v. Dale,* 62 Tex.Civ.App. 277, 131 S.W. 308 (Tex.Civ.App.1910, no writ). Restrictive clause 3 above set out is not violated. Again, we sustain points of error fifteen and sixteen.

The plaintiff(s) have failed to meet their proper burden. The sustaining of points ten, eleven, fifteen, and sixteen form an independent, separate, distinct basis for reversing the judgment below, dissolving the temporary and permanent injunctions and rendering judgment that Kinnear, "et al", take nothing of and from DET. Kinnear, "et al", have primarily based their cause of action on the restrictive covenants. The restrictive covenants have not been violated.

### *Part II—The Federal Statutes*

It is noteworthy and significant that 42 U.S.C.A. § 3604 (Supp.1994) forbids discrimination in housing. The operative part of the statute states that it shall be unlawful to discriminate in the sale or rental or otherwise make unavailable or deny a dwelling to any buyer or any renter because of a handicap of any person residing in or intending to reside in a dwelling place. The concept of a dwelling or a dwelling place encompasses vacant land upon which residential structures are to be constructed or located. 42 U.S.C.A. § 3602(b). Section 3602(b) reads:

> "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence ... and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

Congress has made a declaration of policy in section 3601 stating:

> It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

Significantly, section 3615 is construed to encourage and augment any law of a State or subdivision of a State that grants, guarantees, or protects the same rights that are granted by this Federal chapter. But, section 3615 further provides that:

> [A]ny law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice ... shall ... be invalid.

■ We therefore sustain appellant's points of error twenty and twenty-one because we conclude that the Federal Fair Housing Act (42 U.S.C.A., Chapter 45 entitled "Fair Housing Act", § 3601 et seq.) and the Americans with Disabilities Act of 1990 (42 U.S.C.A., Chapter 126 entitled "Equal

Opportunity for Individuals With Disabilities", § 12101, et seq.), have relevant application and germane paramountcy to the issues raised by appellant in points of error twenty and twenty-one. Points twenty and twenty-one maintain that the trial court erred in concluding that the Federal Fair Housing Act and the Americans With Disabilities Act have no application in this case. We agree; the trial court erred.

■ The "handicapped" provisions of the Fair Housing Act apply retroactively to housing owned or in existence on the effective date of the Act. The prohibitions against any discrimination (based in a handicap) is applicable to discriminatory conduct in any lease situation or rental situation or sale of any residence or dwelling (including vacant land) which occurs after the effective date of that Act. *See U.S. v. Forest Dale, Inc.,* 818 F.Supp. 954 (N.D.Tex.1993). We quote from *U.S. v. Forest Dale, Inc.:*

> Defendants argue that the "handicap" provisions of the Fair Housing Amendments Act of 1988 do not apply retroactively to housing owned and in existence on the effective date of the 1988 Act. Defendants' argument would effectively make the Act applicable only to housing constructed after the effective date of the Act. This construction of the Act is plainly wrong. The Act makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap."

Thus, the Fair Housing Act is applicable to State land use laws and local land use laws and ordinances and requires that such laws be modified, if necessary, to afford to handicapped persons the same opportunity to housing as those who are not handicapped. This retroactive law applies to vacant, unimproved lots.

■ State statutory restrictions affecting Federal fair housing policies must yield to the Federal Fair Housing Act and for this reason and on this rationale the provisions of TEX.PROP.CODE ANN. § 202.003(b) (Vernon Supp.1994) that states no restrictions are to apply to property used as a family home must prevail over any attempted limitations under TEX.HUM.RES.CODE ANN. § 123.003 (Vernon Supp.1994). TEX.PROP.CODE ANN. § 202.003(b) is superior to TEX.HUM.RES. CODE ANN. § 123.003(b). The attempt to enforce restrictive covenants dated before September 1, 1985, is impermissible under the rule of federal law supremacy. The Federal Fair Housing Act does not violate the provisions of the United States Constitution. And this federal legislation was and is effective and had the intention and purpose of disallowing restrictive land use practices sought to be justified by State statutory enactments. Indeed, state court action is not permitted to deprive or limit the ability of handicapped individuals to live in the residence of their choice in their own familiar communities.

We think the case of *Rhodes v. Palmetto Pathway Homes, Inc.,* 303 S.C. 308, 400 S.E.2d 484 (1991) is well reasoned and compellingly persuasive. We quote from *Rhodes:*

> The Fair Housing Amendments Act of 1988 articulates the public policy of the United States as being to encourage and support handicapped persons' right to live in a group home in the community of their choice. 42 U.S.C. §§ 3602–3608 (Supp. 1990). "This provision is intended to prohibit special restrictive covenants ... which have the effect of excluding ... congregate living arrangements for persons with handicaps." H.R.Rep. No. 100–711, 100th Cong.2d Session, 23 (1988), U.S.Code Cong. & Admin.News 1988, pp. 2173, 2184. Since the need for treatment and maintenance of the mentally handicapped is a legitimate and strong public interest as recognized by state and federal legislation, a refusal to enforce restrictive covenants against otherwise unobtrusive group homes substantially advances that interest by promoting integration of the mentally handicapped into all neighborhoods of the community. *Westwood Homeowners Association v. Tenhoff,* 155 Ariz. 229, 745 P.2d 976 (Ariz.App.1987).
>
> The Michigan Appellate Court made a persuasive statement on public policy regarding handicapped individuals in *Craig*

v. *Bossenbery, supra,* [134 Mich.App. 543, 351 N.W.2d 596 (1984)] declaring:

> The strong public policy supporting group homes overcomes the public policy which favors the right of property owners to create restrictive covenants. We cannot consider the property owners' apparent motive in drafting or retaining a covenant unless we encourage indirect methods to exclude the handicapped where blatant, direct methods would clearly fail.

351 N.W.2d at 601.

The Fair Housing Act (as popularly known and named) explicitly mandates that discrimination (in the sale of a dwelling or a plot upon which would be erected a dwelling or to otherwise make unavailable or to deny such dwelling or residence to any buyer because of the handicap of a person residing in or intending to reside in that dwelling) is clearly unlawful. 42 U.S.C.A. § 3604(f)(1)(B). In addition, the Fair Housing Act makes it unlawful to coerce, intimidate, threaten, *or interfere* with any person in the exercise or enjoyment of, or on account of, his having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected by the Fair Housing Act. 42 U.S.C.A. § 3617.

■ Significantly, and of import, under the Fair Housing Act, mental retardation—the exact disability suffered by the prospective residents—is protected from discrimination. 24 C.F.R. § 100–201(a)(1). The plaintiffs below do not dispute that the prospective occupants of the family home/community home will be mentally retarded or mentally disabled Texas citizens. Both DET and the prospective mentally retarded residents—but especially the DET—are aggrieved persons under the Act because they have been injured by a discriminatory housing practice; this discriminatory housing practice is unlawful under federal statutory enactments. 42 U.S.C.A. § 3602(i)(1). And DET may sue and ask for relief under the Fair Housing Act based on housing discrimination against the mentally retarded. *See and compare U.S. v. Scott,* 788 F.Supp. 1555 (D.Kan.1992).

■ It is now well established that the Fair Housing Act prohibits the enforcement of restrictive covenants that discriminate or have the effect of discriminating on the basis of handicap. *Id.* The Fair Housing Act has been declared to prohibit special restrictions, special restrictive covenants, or other terms or conditions or denials of service because of an individual's handicap and which exclude congregate living arrangements for persons with handicaps. *Id.* Indeed, the Act itself protects against efforts to restrict the ability of individual persons with handicaps to live in communities.

Thus, by attempting to enforce the challenged restrictive covenants to prevent mentally handicapped individuals from residing in their neighborhood (as the uncontroverted facts before us reveal), the plaintiffs have "otherwise ma[de] unavailable or den[ied]" a dwelling or a residence to DET and the mentally handicapped or mentally retarded individuals. 42 U.S.C.A. 3604(f)(1)(B).

Admittedly, the phrase "otherwise make unavailable or deny" has been broadly construed to include all the various practices which make unavailable or deny dwellings or residences to individuals on the prohibited grounds. It has been held that subdivision residents had violated the Fair Housing Act through their interference with a neighbor's sale of the neighbor's property to an operator of group homes for the mentally retarded by bringing a state court action to enforce certain restrictive covenants. One of the concerns that was weighed and disallowed was the fear of the subdivision residents that the prospective handicapped persons of the family home or community home would cause a depreciation in the property values. *U.S. v. Scott, supra.*

The rule of federal law supremacy requires that we heed the Federal Fair Housing Act inasmuch as federal statutes supersede within their proper realm the State statutes. Our rulings and rationale in Part II comprise a separate and independent basis for reversing the judgment below and dissolving the injunctions.

### Part III—Texas Public Policy, Police Power, and Statutes

 The plaintiffs below challenge the State's exercise of its police powers on the grounds that constitutional provisions restrict these police powers through the due process and equal protection clauses of the federal constitution and similar clauses in the state constitution. We will endeavor to decide this appeal on other than constitutional issues.

Initially, our Court turns to the validity of the exercise of the State's police powers. Undoubtedly, Texas has expressly recognized its public policy of providing mentally retarded persons with a certain quantum and standard of care in normal environments and surroundings in the Texas Mental Health and Retardation Act, TEX.REV.CIV.STAT.ANN. art. 5547–201 § 1.01(c) reading: "It is the policy of this state that when appropriate and feasible, mentally ill and mentally retarded persons shall be afforded treatment in their own communities." This policy has been reaffirmed and codified in TEX.HEALTH & SAFETY CODE ANN. § 531.001(d) (Vernon 1992).

 Unquestionably, the State legislature's concern and policy was to promote and protect the welfare and the care of the mentally retarded through the exercise of the State's police powers. Hence, we conclude— and it is obvious—that the State has a valid governmental interest in the welfare of the mentally handicapped and the mentally retarded citizens of Texas. In the *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the United States Supreme Court held that the State of Texas had a right and a valid governmental interest to provide and support deinstitutionalized care for those citizens who suffered from mental disorders through the exercise of the police powers of Texas. And this deinstitutionalized care was a legitimate state interest. The language and rationale of the United States Supreme Court in *City of Cleburne* is both informative and persuasive:

Such legislation thus singling out the retarded for special treatment reflects the real and undeniable differences between the retarded and others. That a civilized and decent society expects and approves

such legislation indicates that governmental consideration of those differences in the vast majority of situations is not only legitimate but also desirable. It may be, as CLC contends, that legislation designed to benefit, rather than disadvantage, the retarded would generally withstand examination under a test of heightened scrutiny.

473 U.S. at 444, 105 S.Ct. at 3256–57.

We determine that the "heightened scrutiny" test is satisfied. But we determine that the real test and the correct rule is that legislation is presumed to be valid and constitutional and will be sustained if the classification drawn by the legislative branch is rationally related to a legitimate state interest. Hence, when social or economic or health legislation is at stake, the Equal Protection Clause allows the State broad latitude. Appellees' claims based on the Equal Protection Clause are not sustainable.

 This intermediate court is cognizant of the fact that in the *City of Cleburne, supra,* the question addressed was the City's right to enforce a zoning ordinance and not the individual's right to enforce a deed restriction as we are confronted with here. But that factual situation, we perceive, fails to alter the result. The fact that the relevant rehabilitative legislation involves social issues, welfare issues, and public health issues brings this case and its record squarely within the general rule. Necessarily, then, the Equal Protection Clause does not limit or restrict a state's validly exercised police power. The Equal Protection Clause only requires that the classification, enunciated by the statute, be rationally related to a legitimate state interest. The Texas statutes are definitely rationally related to a legitimate State interest.

The "Due Process" clauses of the United States and the Texas Constitutions must be balanced *vis-à-vis* the personal or property rights of individuals when the public welfare, including the public health, is implicated through the State's police powers.

The "Interpretative Commentary" of Article I, section 19, of the Texas Constitution speaks of such balancing of the broad goals of the State's police powers against the con-

stitutional protections of due process. This interesting commentary recites in relevant part:

> Due process of law not only includes procedural protection, but also substantive protection. It is a direct constitutional restraint upon the substance of legislation and means that a legislative curtailment of personal or property rights must be justified by a resultant benefit to the public welfare....
>
> [T]he exercise of the police powers is not unrestricted, but is limited to enactments having reference to the public health, comfort, safety and welfare. It must not be arbitrary, unreasonable, or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the object sought to be attained.

Very significant is the fact that the commentary specifically notes that the enactments need to have reference to the public health, safety, comfort, and the public welfare. We are here dealing directly with public health and welfare and directly with mental health and mental retardation of impaired Texans.

We sanguinely hold and find that Texas has a valid and legitimate State governmental interest in protecting and promoting the public health and welfare of the mentally ill and the mentally retarded and consequently, the "Equal Protection" and "Due Process" clauses do not proscribe a state's legitimate exercise of police power. And this finding has special additional force and probative value when the police power is exercised in relationship to the public health and the public welfare reinforced by a declared public policy. The restrictive covenants relied upon by the plaintiffs below, must yield to the exercise of the state's legitimate police power. Appellees' contentions based on "Equal Protection" and "Due Process" are specious.

## A: Appellant's Points of Error Two, Three, and Four

■ The appellant DET (in its points of error two, three, and four) complains that the trial court erred in refusing to conclude that Bay Meadows restrictions were preempted as to community homes by TEX.HUM.RES.

CODE ANN. § 123.001, et seq. (Vernon Supp. 1994); that the trial court erred in holding that the Texas Human Resources Code controls the language of the TEX.PROP.CODE ANN. § 202.002(a) (Vernon Supp.1994); that the trial court erred in concluding that the subject restrictive covenants which predated TEX.HUM.RES.CODE ANN. § 123.003(b) are specifically authorized by that statute. DET supplements these points of error by stating that these conclusions and findings are erroneous and the evidence is legally insufficient to support such conclusions.

Chapter 123 of the Texas Human Resources Code is entitled and popularly known as "Community Homes for Disabled Persons Location Act." The Act contains a definition of the phrase "person with a disability" which includes mental retardation, or emotional illness. The statutory scheme specifically provides that the use and the operation of a community home under Chapter 123 is a *use by right,* and the same is authorized *as a use by right in any district zoned as residential.* The qualifications to meet the status of a "community home" are set out in TEX.HUM. RES.CODE ANN. § 123.004. Subsection (b) of § 123.003 invalidates any reservation, restriction, exception or other provision in an instrument created or amended on or after September 1, 1985, as the same relates to the transfer, sale, lease, or use of property as a community home. Subsection (b) does not speak to any such restrictions, reservations or exceptions created before September 1, 1985.

The predecessor of §§ 123.001, et seq., was TEX.REV.CIV.STAT.ANN. art. 1011n. Chapter 123 was added in codifying the Acts of 1985, 69th Leg, R.S., Ch. 303. Chapter 303 provided in substance that "family home" means a community based residential home, and that permitted use means *use by right* that is authorized in all residential zoning districts in this state. Chapter 303 set forth the family home requirements as well as the family home usages. If the community home meets the requirements in §§ 123.005, 123.-006, 123.007, and 123.008; then that community home is entitled to *a use as a matter of right in any district zoned as residential.* In Section 2(4) of Chapter 303, "family home"

means a community based residential home when operated by the Texas Department of Mental Health and Mental Retardation. Thus, here, we deem the proposed structure or residence to be both a "family home" and a community based residential home.

## B: Texas Property Code Ann. Chapter 202

TEX.PROP.CODE.ANN. § 202.002 provides that Chapter 202 applies to all restrictive covenants regardless of the date on which they were created, and § 202.003(b) states that a "family home" is a residential home that meets the definition of and requirements applicable to a family home under the Community Homes for Disabled Persons Location Act (TEX.HUM.RES.CODE ANN. § 123.001, et seq.). And importantly, a dedicatory instrument or restrictive covenant may not be construed to prevent the use of property as a "family home". Most importantly, § 202.003(b) mandates that any attempted restrictive · covenant that applies to property used as a "family home" shall be liberally construed and construed to give effect to the purposes and intent except that no construction will be allowed which will restrict the use of a "family home". This statute took effect June 18, 1987. The statute clearly provides that a "family home" is a residential home that meets the definitional requirement applicable to "family home" under the Community Home for Disabled Persons Location Act and significantly, this same section 202.003(b) clearly declares that any dedicatory restrictive covenant may not be construed to prevent the use of property as a "family home".

Upon reading and analyzing Chapter 303, Acts of 1985, 69th Leg., R.S., Sections 1 through 7 inclusive, and construing and analyzing TEX.HUM.RES.CODE ANN. §§ 123.001 through 123.010 inclusive, we conclude that *family home and community home are used interchangeably and that their definitions, qualifications, functions and services, are for all practical and pragmatic purposes the same.* As a salient example, Section 3 of Chapter 303 provides that a "family home" must provide to the disabled residents services such as food and shelter, personal guidance, care, habilitation services, supervi-

sion—and TEX.HUM.RES.CODE ANN. § 123.005 provides that a "community home" shall provide the following services: (1) food and shelter; (2) personal guidance; (3) care; (4) habilitation services; and (5) supervision. The services are not only the same; they are identical and the wording in both statutes are identical and are listed in the same order.

It is not disputed that the structure that DET plans and proposes to construct on its plot in Bay Meadows Addition is a "family home" as contemplated in TEX.PROP.CODE ANN. § 202.003 and a "community home" as that term is set out and defined in TEX.HUM.RESOURCES CODE ANN. § 123.004. Indeed, TEX.PROP.CODE ANN. § 202.003(b) actually refers to the "definition of and requirements applicable to a family home under the Community Homes for Disabled Persons Location Act (Article 1011n, Vernon's Texas Civil Statutes)."

Therefore, construing in a balanced and harmonious way TEX.PROP.CODE ANN. § 202.003 and TEX.HUM.RES.CODE ANN. § 123.001 et seq., and the prior law, article 1011n (as referred to in the Texas Property Code) constrains us to hold that the restrictive covenants in Bay Meadows Addition simply are not efficacious as against DET's proposed family home/community home. The Texas Property Code makes its relevant sections applicable to all restrictive covenants regardless of the date on which they were created. The same Property Code in Section 202.003(b) mandates that the appellees may not rely upon any type of restrictive covenant or deed restriction to prevent the use of real property for a community home. This subsection in clearest language declares that a dedicatory instrument or restrictive covenant may not be construed to prevent the use of property as a family home and moreover, any restrictive covenant that applies to property used as a family home or a community home shall be liberally construed in favor of any such home—except that any construction that would restrict the use of the property as a family home or a community home *is disallowed.* The two statutes noted above and their subsections when read together mandate clearly that no restrictive covenant, deed restrictions, or other dedicatory instru-

ment may be construed by any court to prevent the use of any property in this State *as a family home or as a community home in any district designated as residential.* Thus, the trial court erred in reaching the conclusion that the restrictive covenants were valid as against DET. The trial court also erred in determining that these restrictive covenants would be breached by DET's construction and operation of a proposed residential family home/community home. Appellant's points of error two, three, and four are sustained. We conclude that the State statutes as dealt with in this opinion require a reversal of the judgment and a rendition that the injunctions be dissolved.

## C: Appellant's Points of Error Five, Six, and Seven

█ DET groups its points of error five, six, and seven. These points challenge the trial court's conclusions that: TEX.PROP.CODE ANN. § 202.003(b) is void and unconstitutional since such statute fails to define "family home"; TEX.REV.CIV.STAT.ANN. art. 1011n having been repealed and recodified was meaningless and any reference to that statute was without weight; and, TEX.HUM.RES. CODE ANN. § 123.001 et seq., "Community Homes for Disabled Persons Location Act", violated the provisions of the United States and Texas Constitutions.

The trial court concluded that Chapter 202 of the Property Code was and is unconstitutionally vague; but, Chapter 202 of the Property Code specifically refers to article 1011n in which a "family home" or a "community home" is clearly defined. Such "home" is: (1) operated by the Texas Department of Mental Health and Mental Retardation (Department), and/or (2) is a community center which provides services to disabled persons, (3) is a non profit corporation, (4) is an entity certified by the Texas Department of Human Resources as a provider serving persons with mental retardation in intermediate care facilities. We disagree with the trial court's conclusion.

The term "community home" is consistent with the title of the act in the recodified enactment under the Texas Human Resources Code. Significantly, the definition of "community home" as set out in TEX.HUM. RES.CODE ANN. § 123.004, and the definition of "family home" as set out in TEX.REV.CIV. STAT.ANN. art. 1011n § 2, are identical in substance. Chapter 202 of the Property Code is not impermissibly vague or unconstitutionally vague.

The chronology of TEX.REV.CIV.STAT.ANN. art. 1011n, with its subsequent repeal and recodification in TEX.HUM.RES.CODE ANN. § 123.001, et seq., and the Texas Property Code make it clear that "family home" in Chapter 202 of the Property Code must be construed the same as "community home" in TEX.HUM.RES.CODE ANN. § 123.001 et seq.

█ Under rules of correct statutory construction, a primary and principal rule of statutory construction is that legislative enactments which are involved with the same general subject matter and also possess the same general purpose or purposes are considered to be and are construed to be *pari materia.* Such statutes are *pari materia* even though these statutes may fail to contain any reference of one to the other and even though the statutes may have been passed at different times or at different legislative sessions. The purpose of the *pari materia* rule of construction is to fulfill the legislative intentions. *See Calvert v. Forth Worth National Bank,* 163 Tex. 405, 356 S.W.2d 918 (1962). Significantly and of paramount importance is the rule that a revision or recodification of law (as we have here in the Texas Human Resources Code) is to be construed as a continuation of previously existing law. *Hartford Fire Ins. Co. v. Walker,* 94 Tex. 473, 61 S.W. 711 (1901).

Therefore, when the wording and the language in the recodification is substantially the same and the functions of the family home or community home are identical to that of the former article 1011n, it should be held that they convey the same intent and meaning. *See Texon Amusements v. State,* 90 S.W.2d 871 (Tex.Civ.App.—Fort Worth 1936, no writ). Reenactment and recodification—especially as to the vital function and services of family homes and community homes, as here,—are strongly and compel-

lingly persuasive that the legislative intent was the continuation of the prior law.

 Statutes of rehabilitation should be construed in a liberal and humanitarian mode; thus, effectuating successfully the legislative objectives and intentions. Such construction of the rehabilitative statutes promote the public interest, the public welfare, the public health, public state policy, and the police powers. Such salutary constructions properly disregard technical and meaningless distinctions but give the enactments the most comprehensive application of which the enactments are susceptible absent any violence to the language therein. *See Maryland Casualty Co. v. Smith,* 40 S.W.2d 913 (Tex.Civ. App.—Dallas 1931, no writ).

 Legislative enactments are presumed to be constitutional and that constitutionality is intended by the legislature as to the State Constitution and the United States Constitution. It is clearly presumed, and it is a strong presumption, that in such rehabilitative legislation the public interest and the public welfare is definitely favored over a private interest. TEX.GOV'T CODE ANN. § 311.021(5) (Vernon 1988). Furthermore, it is presumed that the Texas lawmakers acted carefully, deliberately, intelligently, openly, purposefully, and exercised discretion in a prudent and wise manner; the legislature is not ever presumed to have done a useless, futile act. *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983). We determine that TEX.HUM. RES.CODE ANN. § 123.001, et seq., and TEX. PROP.CODE ANN. Chapter 202 are constitutional. We sustain points of error five, six and seven.

## D: Appellant's Point of Error One

DET avers in its point of error one that the trial court erred in granting temporary and permanent injunctions preventing the construction and operation of a "community home/family home" in the Bay Meadows subdivision. The injunctions were founded principally on the restrictive covenants. As noted above, we determine that the clear language of the statutes leave no doubt of the intentions of the Texas legislature to pronounce and enforce a public policy, supplemented by police powers, that subdivision restrictions cannot be used to deny equal housing opportunities to the citizens of Texas who are mentally impaired. The attempted restriction in this appeal refers to "one one-family residence". *See Permian Basin Centers v. Alsobrook, supra.* As noted previously, the restrictive covenants in question simply deal with the architecture or the form and design of the structure. *Id. See Collins v. City of El Campo,* 684 S.W.2d 756 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.). The Federal statutes reenforce TEX.PROP. CODE ANN. § 202.003(b) in its broad scope in providing that a dedicatory instrument or restrictive covenant may not be construed to prevent the use of property as a family home. *See* 42 U.S.C.A. § 3604. We sustain appellant's point of error one.

## E: Appellant's Point of Error Eight

In appellant's point of error number eight, DET contends the trial court erred in concluding that TEX.HUM.RES.CODE ANN. § 123.-001 et seq. and/or Chapter 202 of the Texas Property Code violated provisions of the Texas Constitution and the United States Constitution. These statutes above noted (both state and federal) are not arbitrary, capricious, unreasonable; nor do they obviously or patently go beyond the reasonable necessities of the pressing problems involving public health, safety, comfort, and the public welfare. Neither constitution is offended. We, therefore, sustain DET's point of error number eight.

## F: Appellant's Point of Error Nine

 Appellant's point of error number nine complains that the court erred in refusing to find that the proposed community home would meet in the future the statutory requirements. The "Community Homes for Disabled Persons Location Act" not only permits but authorizes the establishment of a community home or family home for persons with disabilities so long as the statutory requirements are met. The basic requirements are: it must have six or fewer persons with disabilities. There can be no more than two supervisors. TEX.HUM.RES.CODE ANN. § 123.006. The community home must be

operated by the Texas Department of Mental Health and Mental Retardation. It must be a non-profit corporation. Section 123.004. And the Act covers specific groups of persons with ascertainable and certain disabilities. However, persons disabled by drug or alcohol abuse are not protected. They are, in fact, excluded. There is a limitation as to cars, being one per bedroom. TEX.HUM.RES. CODE ANN. § 123.009. We determine that there is no evidence or issue that the proposed future construction of DET fails to meet the statutory definitions and the requirements of a "community home" and of a "family home". Point of error nine is sustained.

## G: Appellant's Points of Error Twelve, Thirteen, and Fourteen

In points of error twelve, thirteen, and fourteen, DET challenges the trial court's finding that Deep East Texas is a commercial enterprise and constitutes a business and has a commercial purpose. There is simply no evidence to support this finding and the statutory enactments involved clearly negate that DET is a business or a commercial enterprise. Indeed, Deep East Texas is a governmental unit and entity which has a stated purpose of habilitation of certain handicapped individuals. DET is not a commercial or business entity.

Additionally, the legislature has considered the proposition of whether a community home or a family home violate restrictive covenants against business and commercial enterprises. The appellees are bound by the legislative determination. The legislature has determined that the construction and operation, for example, of a community home does not violate the restrictive covenants against business and commercial firms. DET Regional MHMR is classified and categorized as a unit of government by the force of statute. TEX.CIV.PRAC. & REM.CODE ANN. § 101.001, et seq. A community home is classified as a unit of the government pursuant to section 101.001(2)(C). The question is also settled by TEX.HEALTH & SAFETY CODE ANN. § 534.001 (Vernon 1992), which states that a community home or community center is defined by statute as a state agency or a

governmental unit or a unit of local government as defined by Chapters 101 and 102 of the Texas Civil Practice & Remedies Code.

The declared purpose of Deep East Texas Regional Mental Health and Mental Retardation is manifestly to provide for the effective and efficient administration and coordination of mental health facilities and services at the State and local level. It is clear that *the mentally ill and mentally retarded persons shall be afforded treatment in their own communities.* TEX.HEALTH & SAFETY CODE ANN. §§ 531.001, 531.002 (Vernon 1992). We sustain the points of error of appellant numbered twelve, thirteen, and fourteen.

The court below impliedly found and concluded that the appellees would sustain money damages from the construction and operation of the community home, and that even the proposed construction and maintenance of the community home would decrease the property values in the subdivision. And the court further found that safe family environment would be destroyed by the construction and operation of the proposed community house. We conclude that this was error since there was no evidence to sustain the conclusion that the appellees would suffer money or economic damages. Moreover, the legislature has addressed these issues of damages when it enacted "The Community Homes for Disabled Persons Location Act" as well as Chapter 202. The legislature determined that no such damages would be recoverable by residents, or, in the alternative, would be outweighed by benefits to the public. The legislature was clearly and correctly exercising the police power of the State.

The public policy of Texas coupled with and intermingled with the proper exercise of its police power disallows, under this record, these damages. The statutory enactments, the rehabilitative statutes, and rehabilitative purposes of the legislature clearly show that these laws are directed towards the improvement of mental health. It is a public policy involving public health and public welfare and public safety. We sustain appellant's points of error seventeen, eighteen, and nineteen. In view of our above opinion, we do not reach appellant's other complaint. We

conclude that the points of error resolved above are fully dispositive of this appeal.

### Part IV—The Impairment of Contract Issues

Furthermore, there is no violation of the "Impairment of Contract" clauses in the Federal and State constitutions. Concerning the constitutionality of any State statute, the correct rule is that we must begin with a presumption of validity. Our Supreme Court has written:

> We recognize that "[i]n passing upon the constitutionality of a statute, we begin with a presumption of validity. It is to be presumed that the Legislature has not acted unreasonably or arbitrarily; and a mere difference of opinion, where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable." *Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968).

*Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex. 1983).

With the initial presumption of constitutionality, then the issue is whether the State statutes in question comport with the constitutional protections of due process. The established rule is that due process only requires that the means selected by the legislature has a reasonable and rational relationship to the purpose or object of the statutory enactment. If the statute is not arbitrary and its purpose is real and meaningful, being founded on a proper governmental interest; then, the exercise of the police power does not offend the due process clause of the United States Constitution. Nor does it offend the due process clause of the Texas Constitution. *City of Cleburne, supra.* The rehabilitative State statutes are not arbitrary; they have a real and rational relationship to public health and public welfare.

Moreover, all property, we conclude, is held subject to the valid exercise of the police power of a state. Due process protections are not infringed upon by a proper usage of police power. A seminal case is *Lombardo v. City of Dallas,* 124 Tex. 1, 73 S.W.2d 475 (1934), in which the Texas Supreme Court wrote (quoting from 30 Texas Jurisprudence, p. 120, § 58):

> *"All property is held subject to the valid exercise of the police power; nor are regulations unconstitutional merely because they operate as a restraint upon private rights of person or property or will result in loss to individuals.* The infliction of such loss is not a deprivation of property without due process of law; the exertion of the police power upon subjects lying within its scope, in a proper and lawful manner, is due process of law. Moreover, police regulations to not constitute a taking of property under the right of eminent domain; and compensation is not required to be made for such loss as is occasioned by the proper exercise of the police power...." (Italics ours.) [emphasis theirs]

The rehabilitative statutes except from the restrictive covenants mentally retarded persons and mentally ill citizens who are cared for under the family home or community home program. Holding, as we have, that a valid exercise of the State's police power has been properly engaged, then it becomes readily apparent that the plaintiffs' due process claims, either under the United States or the Texas Constitutions, have not been violated. By like reasoning we hold that the application of the referenced and rehabilitative statutes under this record do not result in the denial of any alleged equal protection rights set out by the Fourteenth Amendment of the United States Constitution or Article I, section 3, of the Texas Constitution.

We hold that any equal protection challenge must be balanced and weighed against the rational relationship test and the State's police power concerning public health and welfare. The rehabilitative statutes were designed to benefit the mentally retarded and the mentally ill. They are definitely rationally and reasonably related to a legitimate state interest.

By the enactment of section 202.003(b) of the Texas Property Code, the State legislature recognized that mentally retarded persons comprise a distinct class of citizens. Such legislation was designed to promote the legitimate State interests of assimilating and administering to and caring for mentally re-

tarded persons in a normal, usual, community setting—all toward the salutary end of benefitting and improving their ability to function in today's society. The scope of the rehabilitative statutes connotes that the legislature envisioned a community with no walls. But, importantly, section 123.003(b) of the Texas Human Resources Code concerning deed restrictions must yield to the State's declared public policy enforced through its police powers. *Energy Reserves v. Kansas Power & Light*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983); *Texas State Teachers Ass'n v. State*, 711 S.W.2d 421 (Tex.App.—Austin 1986, writ ref'd n.r.e.).

Even if a substantial impairment of private contract rights or deed restrictions or covenants are involved, these private contract rights must yield and any such substantial impairment is definitely outweighed by the State's right to exercise its police power. The rehabilitative statutes and other statutes attacked by the appellees do pass constitutional muster because these statutes serve a legitimate public purpose and because the scope of the harmonious legislation is reasonable to attain its public health, public welfare and public safety purposes. *See Energy Reserves v. Kansas Power & Light, supra.*

### Part V—Summation

In summary, the legislature has considered the problem of Texas citizens who are mentally retarded or mentally impaired and has dealt comprehensively through legislation with those concerns and problems. The legislature pronounced a public policy of the State of Texas and coupled therewith the State's exercise of police powers and the Texas solons clearly decided that mentally disabled people can live in any neighborhood regardless of zoning, regardless of restrictions, and regardless of restrictive covenants. The Federal statutes mandate the same public policy.

Therefore, we conclude that no restrictive covenant or deed restriction can deny or limit the ability of such disabled persons who meet and quality under the statute to live anywhere in the State that they choose. In view of the public policy announced and the statutes noted, we are constrained to find that the trial court did abuse its discretion in ordering a permanent injunction against the construction and operation of the proposed community home/family home.

We thus sustain the points of error urged by the appellant on the basis of legal insufficiency and we hereby render judgment dissolving the injunctions prohibiting the appellants from proceeding with the construction of the proposed community/family home. As well, our opinion is squarely grounded on statutory law separate and apart from legal insufficiency consideration.

In view of the manner in which the parties briefed and argued this appeal, we necessarily had to pass upon certain constitutional issues. But we stress that Part I, Part II, and Part III—each standing alone and acting independently and separately from each other—require the judgment below to be reversed, the injunctions dissolved, and that Kinnear, "et al", take nothing of and from DET.

REVERSED AND RENDERED.